**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| **MAST POWERTRAIN, LLC** | § | |
| | § | |
| | § | **CIVIL ACTION** |
| **vs.** | § | |
| | § | **NO. 9:23-cv-162** |
| **POWER SOLUTIONS** | § | |
| **INTERNATIONAL, INC.** | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **MAST POWERTRAIN, LLC,** (hereinafter, "Plaintiff"), and would file its Original Complaint over and against **POWER SOLUTIONS INTERNATIONAL, INC.** (hereinafter, "Defendant"), and for cause of action, would respectfully show unto this Court as follows:

### A.  PARTIES

1.      Plaintiff is a Texas limited liability company that is organized under the laws of the State of Texas.  Plaintiff's principal place of business is in Nacogdoches County, Texas with its headquarters located at 330 NW Stallings Dr., Nacogdoches, TX 75964.  Plaintiff is a citizen of Texas.  Plaintiff is not a citizen of Delaware or Illinois.

2.      Defendant is a corporation that is incorporated under the laws of the State of Delaware.  Defendant's principal place of business is in the State of Illinois with its headquarters located at 201 Mittel Drive, Wood Dale, IL 60191.  Defendant is a citizen of Delaware and Illinois.  Defendant is not a citizen of Texas.

## B.  JURISDICTION AND VENUE

3.      Jurisdiction and venue are proper in the United States District Court for the Eastern District of Texas, Lufkin Division.

4.      Plaintiff is a citizen of Texas only.  Defendant is a citizen of only Delaware and Illinois.  Plaintiff is seeking monetary relief in excess of $6,000,000.  Accordingly, the Court has subject matter jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiff and Defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

5.      At all relevant times, Plaintiff and its employees or representatives were located in this judicial district.  Defendant initiated and actively participated in numerous phone calls and video conference calls to Plaintiff and Defendant sent numerous emails to Plaintiff in this judicial district in Texas.  Defendant made material misrepresentations in many of these phone calls, video conference calls, and emails.  All or a substantial part of the events of omissions giving rise to Plaintiff's claims occurred in this judicial district in Texas, Defendant purposefully availed itself of the privileges and benefits of conducting business in Texas by contracting in writing with a Texas resident to perform an obligation in this judicial district in Texas, and by committing a tort in whole or in part in this judicial district in Texas. By reason of Defendant's voluntary business transactions within the State of Texas, including the Eastern District of Texas, the notions of fair play and substantial justice are not offended by suing Defendant in this Court.

6.      Personal jurisdiction over all claims is also proper under doctrine of pendent personal jurisdiction because the Court possesses personal jurisdiction over Defendant for one claim, and all other claims arise out of the same nucleus of operative facts.  Plaintiff's alternative claim for breach of settlement agreement arises out of the same facts Plaintiff relies on for the

intentional tort claims; all of the claims clearly relate to the same course of dealing, and all of the claims arose out of the dealings between Plaintiff and Defendant over their multi-year relationship.

7.     Plaintiff's alternative claim for breach of settlement agreement is also proper in this judicial district under the doctrine of pendent venue.  Under the doctrine of pendent venue, the Court has discretion to entertain all of Plaintiff's claims because they originate from a common nucleus of operative facts.   Plaintiff's fraud related claims and Plaintiff's alternative claim for breach of settlement agreement originate from a common nucleus of operative facts because the fraudulent misrepresentations were made by Defendant to Plaintiff during the parties' settlement negotiations and were made for the purpose of inducing Plaintiff to enter into the settlement agreement.  Furthermore, venue is proper in this judicial district under Section 23 of the settlement agreement as it states, "a non-breaching Party may seek any other remedies available to it, including but not limited to specific performance of this Agreement, and declaratory and injunctive relief in any court of competent jurisdiction."

## C.  **FACTUAL BACKGROUND**

8.     Plaintiff is a privately owned company in the business of engineering, designing, testing, and manufacturing engines and engine components for multiple markets, including automotive, marine, motorcycle, and industrial.

9.     Defendant is a publicly traded company in the business of designing, engineering, manufacturing, marketing, and selling engines and power systems to customers in the energy, industrial, and transportation markets.  Weichai America Corp., a wholly owned subsidiary of the largest car parts and power system conglomerate in China, Weichai Power Co., Ltd. (collectively, "Weichai"), owns the majority of Defendant's common stock giving Weichai control over many

of Defendant's matters and decisions.    Additionally, Weichai has four representatives on Defendant's board of directors which constitutes the majority of the directors.  Weichai is a Chinese government state-owned enterprise that effectively controls Defendant.

10.    On or about April 28, 2011, Plaintiff and Defendant entered into a contract pertaining to the manufacture and supply of aluminum intake manifolds for Defendant's use in Defendant's 8.8L engine assembly (hereinafter, the "2011 Supply Agreement").[1] The 2011 Supply Agreement provides that Plaintiff will manufacture and supply manifolds to Defendant.  Section 4 of the 2011 Supply Agreement provides that Defendant will purchase a minimum of 3,000 manifolds from Plaintiff per contract year.  The terms of the 2011 Supply Agreement commenced on April 28, 2011. Section 10 of the 2011 Supply Agreement provides that it would renew for period(s) of one year unless one party gives the other party at least 180 days' notice prior to the expiration date.

11.    On or about November 4, 2011, Plaintiff and Defendant entered into a contract for the purpose of designing and developing a global engine family platform to fulfill the continuing needs of the industrial, marine, truck, and bus market (hereinafter, the "2011 Engine Development Agreement").[2]  Under the 2011 Engine Development Agreement, Plaintiff agreed to provide development and manufacturing services to Defendant, and Defendant agreed to pay Plaintiff royalties on the products sold by Defendant to end users.

12.    In fiscal year 2016, Defendant began the production and sale of products the subject of the 2011 Engine Development Agreement to end users.  Per Section 6 of the 2011 Engine

---

[1] Exhibit "1", The 2011 Supply Agreement.
[2] Exhibit "2", The 2011 Engine Development Agreement

Development Agreement, Defendant was required to pay royalties to Plaintiff for the products sold to end users.  These products are still being sold to end users.

13.     On February 21, 2020, Plaintiff demanded arbitration against Defendant because Defendant breached the 2011 Engine Development Agreement by refusing to pay Plaintiff the royalties Plaintiff was entitled to under the 2011 Engine Development Agreement.   At the time Plaintiff demanded arbitration, the unpaid royalties totaled over $3,500,000.  The amount of unpaid royalties continues to grow as Defendant continues to sell the products to end users.

14.     During settlement negotiations, Defendant offered Plaintiff two contracts as part of the consideration for Plaintiff dismissing the claims against Defendant and terminating the 2011 Engine Development Agreement.

15.     The first of the two contracts offered during settlement negotiations is the "Engineering Services and Supply Agreement".  Defendant represented to Plaintiff that the purpose of the proposed Engineering Services and Supply Agreement was for the parties to develop up to four engines—the "N6L Engine", the "C6L Engine", the "N7L Engine", and the "7L Engine".  Defendant represented to Plaintiff that the top priority was to develop the N6L Engine. Through December 2019, Defendant was the exclusive supplier of General Motors' (hereinafter, "GM") 6.0L L96/LC8 V-8 engine to on-highway customers.  Defendant represented to Plaintiff that Defendant had been selling approximately 10,000 6.0L L96/LC8 V-8 engines to its top customer, Freightliner Custom Chassis (hereinafter, "Freightliner") per year.  In fact, in 2021, Defendant sold approximately $103.6 million worth of the 6.0L L96/LC8 V-8 engines. Defendant represented to Plaintiff that Defendant urgently needed a replacement for the 6.0L L96/LC8 V-8 engine.  Defendant represented to Plaintiff that the N6L Engine was going to be developed as the replacement for the discontinued GM production of the 6.0L L96/LC8 V-8 engine.  Defendant

represented to Plaintiff that under the proposed Engineering Services and Supply Agreement, Plaintiff would provide engineering and design services in developing the engines as well as exclusively manufacture and supply the engine cylinder heads in connection with the production of the engines.  Defendant represented to Plaintiff that Plaintiff's profits for manufacturing and supplying the engine cylinder heads for only the N6L Engine would be substantially greater than the combined value of the past unpaid royalties and future royalties Plaintiff was entitled to earn under the 2011 Engine Development Agreement.  Defendant represented to Plaintiff that the proposed Engineering Services and Supply Agreement would greatly benefit both parties as Plaintiff would earn more profits than Plaintiff would have under the 2011 Engine Development Agreement and Defendant would have an engine to sell to Freightliner and other customers in place of GM's discontinued 6.0L L96/LC8 V-8 engine.

16.    The second of the two contracts is the "Amendment of the 2011 Supply Agreement".  The only differences between the 2011 Supply Agreement and the Amendment of the 2011 Supply Agreement was the extension of the initial terms of the 2011 Supply Agreement until at least April 28, 2023 and specification changes to part nos. 80000790 and 800001451. Thereafter, the Amendment of the 2011 Supply Agreement would renew automatically for a period of one year unless one party gave the other party at least 180 days' notice prior to the end of the contract year.  Thus, under the Amendment of the 2011 Supply Agreement, Defendant was required to purchase at least 3,000 manifolds from Plaintiff each contract year.

17.    Based on the representations made to Plaintiff by Defendant, Plaintiff decided to accept the settlement offer.  On or about July 27, 2021, Plaintiff and Defendant entered into an agreement to settle the claims the subject of the arbitration (hereinafter, the "Settlement

Agreement").[3] At the time the parties entered into the Settlement Agreement, the unpaid royalties totaled over $4,500,000 less interest, attorney fees, and future royalty payments.

18.    Under the Settlement Agreement, Plaintiff agreed to dismiss the claims against Defendant with prejudice and terminate the 2011 Engine Development Agreement.  As part of the consideration for Plaintiff dismissing the claims against Defendant and agreeing to terminate the 2011 Engine Development Agreement, Defendant and Plaintiff entered into the Engineering Services and Supply Agreement and the Amendment of the 2011 Supply Agreement.   The Engineering Services and Supply Agreement and the Amendment of the 2011 Supply Agreement were incorporated into the Settlement Agreement and made part of the Settlement Agreement as Appendixes II and III.

19.    Section 3(a) of the Engineering Services and Supply Agreement states that the services to be performed under the contract shall be performed in several phases in accordance with the milestones set forth in Exhibit B to the Engineering Services and Supply Agreement. Exhibit B contains ten milestones.  Section 3(a) further provides that the "Parties shall act in good faith to establish timelines for each of the Milestones within 28 days of the execution of [the] Agreement."   Section 9(f) of the Engineering Services and Supply Agreement states that "[Defendant] shall reimburse [Plaintiff] for all reasonable, pre-approved costs and expenses incurred by [Plaintiff] to…manufacture the components necessary to produce a completed, fully-operational prototype of each of the four Engines…."  The first milestone to be completed under Exhibit B is for Plaintiff to supply a prototype of the 6.0L engine.  During the 28-day period following the execution of the Engineering Services and Supply Agreement, Plaintiff made

---

[3] Exhibit "3", The Settlement Agreement.

numerous good faith attempts to work with Defendant to establish timelines for each of the milestones contained in Exhibit B.  Defendant never made any effort to work with Plaintiff to establish a timeline for a single milestone.   Furthermore, pursuant to Section 9(f), Plaintiff submitted multiple proposed budgets to Defendant requesting pre-approval of the costs and expenses Plaintiff would incur to manufacture the components necessary to produce a completed, fully-operation prototype of the 6.0L engine.  Defendant never responded to any of Plaintiff's correspondence regarding the proposed budgets.  Due to no fault of Plaintiff's, the first milestone was never reached, no engines were developed or produced, and no engine components were ever supplied.

20.    Plaintiff continued to perform any and all engineering service obligations required under the Engineering Services and Supply Agreement in good faith to develop the Engines the subject of the Engineering Services and Supply Agreement.  Plaintiff, in good faith, and at Defendant's request, reduced the monthly cost on the total allocated engineering services budget by focusing on the N6L and C6L engines and delaying work on the N7L and C7L engines.

21.    On or about February 27, 2023, Defendant made reference in an email to Plaintiff to a replacement 6.0L engine that was not developed or produced by either Plaintiff or Defendant. Defendant referenced an AER Manufacturing (hereinafter, "AER") 6.0L engine by comparing it to the discontinued GM 6.0L engine.

22.    In or around April 2023, Plaintiff learned that Freightliner was obtaining 6.6L engines directly from GM as an alternative to the 6.0L engine discontinued by GM.  Plaintiff also learned that Defendant was sourcing a 6.0L engine from a different third-party manufacturer. Plaintiff wanted to know when Defendant became aware that Freightliner was obtaining 6.6L engines directly from GM and when Defendant decided to source a 6.0L engine from a different

third-party manufacturer, so Plaintiff obtained a copy of Defendant's fiscal year 2021 10k.  Page 29 of Defendant's fiscal year 2021 10k states that Defendant will "source the 6.0L engine through a GM designated third party manufacturer." Page 29 goes on to state that Defendant anticipates "significantly reduced sales" due to "its large customer obtaining future supply through alternative means…."



**FORM 10-K**

x    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2021

*GM 6.0L Engine Offering*: The Company had an exclusive third-party agreement with GM through December 31, 2019 to purchase and distribute GM 6.0L engines to on-highway customers. With the GM announcement that it will discontinue its production of the GM 6.0L engine, the Company conducted last-time buys of this engine during 2019 through 2021 (including the purchase of certain engines where prepayment was provided), to ensure adequate supply to certain transportation customers. The Company experienced very strong sales of this product within its transportation end market during 2021 particularly with a large customer. At December 31, 2021, the Company had fully exhausted its stock of engines where prepayment was provided and holds a small quantity of other GM 6.0L engines which it expects to deliver to customers throughout 2022. The Company does not have a supply agreement with GM for its successor product to the GM 6.0L engine; however, it will source the 6.0L through a GM designate third party manufacturer. With the exhaustion of 6.0L engine inventory during 2021 where prepayment was received, coupled with its large customer obtaining future supply through alternative means, the Company anticipates significantly reduced sales within its transportation end market in 2022 as compared to 2021. To service customers in the future, the Company has obtained access to a 6.0L engine that another manufacturer will be producing.

23.    Plaintiff recognized that AER was the "GM designated third party manufacturer" that Defendant was sourcing the 6.0L engine. Plaintiff also recognized that Defendant's "large customer" was Freightliner, and that Freightliner was "obtaining future supply through alternative means" by purchasing a 6.6L engine directly from General Motors.

24.    This information contained in Defendant's fiscal year 2021 10K was known to Defendant at the time Defendant offered Plaintiff the Engineering Services and Supply Agreement as consideration for entering into the Settlement Agreement and Mutual Release.  At no point did Defendant disclose this information to Plaintiff, and had Plaintiff known of this information in July 2021, Plaintiff would not have accepted the Engineering Services and Supply Agreement as consideration for entering into the Settlement Agreement.  Furthermore, Defendant obtaining the 6.0L engines from AER was in direct conflict with Section 5(b) of the Engineering Services and

Supply Agreement.  Section 5(b) unequivocally states "[Defendant] shall exclusively…negotiate with [Plaintiff] for the supply of the Engines commencing on the date of this Agreement and for a period of six months thereafter."

25.    Plaintiff's owner and president, Horace Mast (hereinafter, "Mr. Mast"), then contacted Defendant's CEO, Dino Xykis (hereinafter "Mr. Xykis"), to discuss the future of the Engineering Services and Supply Agreement.  During their correspondence, Mr. Xykis stated to Mr. Mast that Defendant's large customer [Freightliner] that purchases the subject engines has never and will never purchase engines other than those supplied by GM or a GM designated third party manufacturer.  Mr. Xykis thereby confirmed that Defendant knew all along that the engines made part of the Engineering Services and Supply Agreement would never be brought to the market, therefore, Plaintiff would never receive a penny of profits for the manufacture and supply of the engine components.

26.    On May 18, 2023, Defendant sent Plaintiff a letter terminating the Engineering Services and Supply Agreement.  In the termination letter, Defendant cites Section 11(a) of the Engineering Services and Supply Agreement claiming that the termination is due to the development of the engine(s) being technically or commercially infeasible.  Clearly, these representations made by Defendant are false and Defendant's true reason for termination is the fact that Defendant is sourcing 6.0L engines with the engine components from AER to serve as a replacement for GM's discontinued 6.0L L96/LC8 V-8 engine.  Furthermore, Section 11(a) states that Defendant cannot terminate the Engineering Services and Supply Agreement on the grounds that is technically or commercially infeasible until after "consultation and good-faith negotiations among the Parties to resolve any deficiencies prior to any proposed termination and to explore alternatives to termination, including but not limited to jointly pursuing other development

opportunities in the market." Defendant made no attempt at consulting with Plaintiff or conducting good-faith negotiations with Plaintiff prior to terminating the Engineering Services and Supply Agreement. Section 11(a) also states that if Defendant terminates the Engineering Services and Supply Agreement on the grounds that it is infeasible commercially or technically, but moves forward with obtaining the engine(s) or components from another source, the termination will be treated as a termination for convenience under Section 11(b)(ii) and Defendant is required to pay Plaintiff the $900,000 buyout amount pursuant to Section 12. Defendant has moved forward with obtaining the engine(s) and components from another source—AER—therefore requiring Defendant to pay Plaintiff the $900,000 buyout.

27.    In July 2021, Defendant knew that it would not exclusively negotiate with Plaintiff for the supply of the engine(s) and Defendant knew that it would pursue sourcing the 6.0L engine from a GM designated third party manufacturer. In July 2021, Defendant knew that Freightliner would never purchase the N6L Engine that was to be developed under the Engineering Services and Supply Agreement because Freightliner "has never and will never" purchase engines other than those supplied by GM or a GM designated third party manufacturer. Defendant also knew that Freightliner had obtained future supply through alternative means by sourcing the 6.6L engine directly from GM as the replacement for the GM 6.0L engine. Defendant never disclosed this information to Plaintiff prior to offering the Engineering Services and Supply Agreement. Defendant instead made false representations to Plaintiff regarding the Engineering Services and Supply Agreement and the monetary value of the Engineering Services and Supply Agreement to induce Plaintiff to enter into the Settlement Agreement and Mutual Release. Defendant knew the unpaid and future royalties the subject of the Arbitration were worth much more than the sham Engineering Services and Supply Agreement; however, Defendant represented the opposite to

11

Plaintiff in hopes that Plaintiff would accept the sham Engineering Services and Supply Agreement thereby saving Defendant millions upon millions of dollars.    Plaintiff justifiably relied on Defendant's representations and accepted the Engineering Services and Supply Agreement as consideration for the settlement rather than continue to pursue the unpaid and future royalties. Plaintiff was justified in relying on the false representations because the purported value of the Engineering Services and Supply Agreement was much more than the unpaid and future royalties. The estimated present value of the unpaid royalties is over $6,000,000.    The amount of unpaid royalties continues to grow as Defendant continues to sell the products to end users.

28.    With respect to the Amendment of the 2011 Supply Agreement, Defendant is contractually required to purchase 3,000 manifolds from Plaintiff per contract year.    Under the Amendment of the 2011 Supply Agreement, Defendant is required to purchase at least 3,000 manifolds from Plaintiff between April 28, 2023 and April 27, 2024 (the current Contract Year). Defendant purchased 3,273 manifolds between April 28, 2022 and April 27, 2023 (the prior Contract Year).    The Amendment of the 2011 Supply Agreement automatically renewed for a period of one year following the expiration of the initial Contract Year because neither party gave 180 days' notice prior to the end of the Contract Year of such party's desire to terminate the Agreement.    The current Contract Year runs through April 27, 2024.    The 273 additional manifolds purchased during the previous Contract Year were carried forward to the current Contract Year; however, Defendant has purchased only 687 manifolds and anticipates purchasing only 270 more through the end of the current Contract Year.    Therefore, Defendant anticipates repudiating the Amendment of the 2011 Supply Agreement by purchasing 1,770 fewer manifolds than Defendant is required to purchase under the Amendment of the 2011 Supply Agreement.    The estimated lost revenue from the 1,770 fewer manifolds is over $500,000.

### D.  **COUNT 1—COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT**

29.     Defendant made numerous representations to Plaintiff that were false statements of fact, false statements of opinion which Defendant knew to be false, and/or false promises of future performance.  Defendant made the false representations knowing they were false.  Defendant intended Plaintiff to rely on the false representations and/or had reason to expect Plaintiff would act in reliance on the false representations.  Plaintiff justifiably relied on Defendant's false representations and Defendant's false representations directly and proximately caused injury to Plaintiff, which resulted in damages further described herein.

30.     Defendant represented to Plaintiff that the purpose of the proposed Engineering Services and Supply Agreement was for the parties to develop up to four engines—the "N6L Engine", the "C6L Engine", the "N7L Engine", and the "7L Engine".   Defendant represented to Plaintiff that if Plaintiff accepted the proposed Engineering Services and Supply Agreement, then Plaintiff would provide engineering and design services in developing the engines as well as manufacture and supply the engine components in connection with the production of the engines. When Defendant made these representations to Plaintiff, Defendant knew that its top customer, Freightliner, would never purchase an engine developed under the Engineering Services and Supply Agreement nor would Plaintiff ever supply certain engine components.   These representations by Defendant were false representations of fact and/or false representations of future performance.

31.     Defendant represented to Plaintiff the primary basis of the Engineering Services and Supply Agreement was to design and develop a suitable replacement for GM's 6.0 Liter L96/LC8 V-8 engine and for Plaintiff to supply the components for the replacement engine. At the time this representation was made to Plaintiff, GM had announced the discontinued production of

the 6.0 Liter L96/LC8 V-8 engine. Defendant's largest customer that purchased GM's 6.0 Liter L96/LC8 V-8 engine from Defendant was Freightliner.  Defendant represented to Plaintiff that Plaintiff was to provide Defendant with the engineering and design services related to the development and production of the 6.0L Engine as a suitable replacement for GM's 6.0 Liter and to provide certain engine components in connection with the production of the engine.  These representations by Defendant were false representations of fact and/or false representations of future performance.  At the time these representations were made, Defendant knew that its customer, Freightliner, "has never and will never" purchase the 6.0L engine unless the engine was supplied by GM or a GM designated third party manufacturer.  At the time these representations were made, Defendant knew that Freightliner would be obtaining GM's 6.6L engine as an alternative to the GM's discontinued 6.0 Liter L96/LC8 V-8 engine.  At the time these representations were made, Defendant knew Freightliner would obtain the alternative engine directly from GM rather than from Defendant. Defendant knew Plaintiff would never supply the components for Defendant's engines for Freightliner because Defendant knew Freightliner would never purchase the engines.  Furthermore, at the time these representations were made, Defendant knew it would not source the engines from Plaintiff because Defendant must source a 6.0L replacement engine from a GM designated third party manufacturer.

32.    Defendant represented to Plaintiff that in its opinion, it forecasted purchase of 65,250 6.0L small block heads / aluminum cylinder heads (the engine components) over the initial five (5) years of engine production. Defendant represented to Plaintiff that Plaintiff's projected profit over the initial five (5) years for the sale of the 6.0L small block heads / aluminum cylinder heads would be $9,135,000.00.  Defendant knew that its opinions as to the future forecasts were entirely false.  Defendant knew that its largest customer would never purchase the engines that

14

were to be developed under the Engineering Services and Supply Agreement.  Defendant also knew that it was going to experience <u>significantly</u> reduced sales of the 6.0L engine because Freightliner would be sourcing the 6.6L as an alternative engine directly from GM.  Defendant's projected forecast was false and the projected profits for Plaintiff were false.  Defendant knew the projected forecast was false and knew the projected profits for Plaintiff were false.  Defendant's representations were false statements of fact and/or false statements of opinion.

33.    Defendant represented to Plaintiff that the value of the Engineering Services and Supply Agreement was much greater than the value of the royalties the subject of the 2021 arbitration.  Defendant knew that this statement of opinion was entirely false.  Defendant knew Freightliner would never purchase the engines to be developed under the Engineering Services and Supply Agreement, Defendant knew that it must source the replacement 6.0L engine from a GM designated third party manufacturer, and Defendant knew that it would never source the replacement 6.0L engine and engine components from Plaintiff for Freightliner.  Thus, Defendant knew the Engineering Services and Supply Agreement had little to no monetary value to Plaintiff since Freightliner would never purchase the engines.  Defendant knew the value of the Engineering Services and Supply Agreement was far less than the royalties the subject of the 2021 arbitration. Defendant knew that its statement of opinion as to Plaintiff's future profits under the Engineering Services and Supply Agreement was extremely exaggerated and far from accurate.

34.    Defendant intended for Plaintiff to act in reliance on the representations and had reason to expect that Plaintiff would rely on the representations.   Defendant made the representations contained in paragraphs 30 to 33 with the intent that Plaintiff rely on the representations and accept the Engineering Services and Supply Agreement as consideration for entering into the 2021 Settlement Agreement rather than pursue the royalties.  Defendant had

reason to expect that Plaintiff would rely on the representations since Defendant retained Gary Winemaster (hereinafter, "Mr. Winemaster") to serve as Defendant's representative during the negotiation process wherein the representations were made.  Defendant was well aware of the fact that Mr. Mast and Mr. Winemaster shared a trusted personal and professional relationship. Defendant knew Mr. Mast would trust the representations made by Mr. Winemaster.  Defendant knew Mr. Winemaster was representing to Plaintiff that Plaintiff would earn extremely high profits under the Engineering Services and Supply Agreement.  Defendant desired for Plaintiff to rely on the false representations.  Defendant knew that the value of the royalties was much more than the value of the sham Engineering Services and Supply Agreement.  Defendant desired for Plaintiff to rely on the false representations and accept the Engineering Services and Supply Agreement as consideration for the settlement so that Defendant could save millions of dollars in royalty payments to which Plaintiff was entitled to under the 2011 Engine Development Agreement.

35.    Plaintiff justifiably relied on Defendant's representations.  Plaintiff knew that Freightliner purchased approximately 10,000 6.0L engines per year from Defendant.  Plaintiff knew that GM was discontinuing the production of its 6.0L engine and that Defendant would need an alternative engine to meet the demands of its main customer, Freightliner, who Defendant represented would be satisfied by the N6L and C6L engines and Plaintiff's supply of engine components.  Mr. Mast and Mr. Winemaster shared a trusted personal and professional relationship before the representations were made and throughout the negotiations period.  Plaintiff had no knowledge that the representations were false nor was Plaintiff aware of facts indicating the representations were false before or at the time the representations were made.  Only Defendant knew that the representations were entirely false.  Plaintiff had no ability to obtain the information that was known only to Defendant.

36.     Defendant's false representations directly and proximately caused injury to Plaintiff, which resulted in damages more particularly described below.

## E.  COUNT 2—FRAUD BY NONDISCLOSURE

37.     In addition to other counts, Plaintiff sues Defendant for fraud by nondisclosure.

38.     Defendant concealed material facts related to the Engineering Services and Supply Agreement.  In particular, Defendant concealed the following material facts: (i) Freightliner would be sourcing a 6.6L engine directly from GM as an alternative to the discontinued production by GM of the 6.0L engine; (ii) Freightliner has never and will never purchase engines other than those supplied by GM or a GM designated third party manufacturer; and, (iii) Defendant must source the 6.0L replacement engine from the GM third party manufacturer, AER.

39.     Defendant represented to Plaintiff that it was going to experience significantly reduced sales of the 6.0L engine unless it found an alternative to the discontinued production by GM of the 6.0L engine.  Defendant represented to Plaintiff that Plaintiff would develop the replacement to the 6.0L engine and that Defendant needed Plaintiff to do so to prevent the reduction of sales.  However, Defendant did not disclose to Plaintiff that Defendant anticipated significantly reduced sales regardless of whether a replacement was developed by Plaintiff.  Defendant knew that it would experience significantly reduced sales since Freightliner was sourcing a 6.6L engine directly from GM as the alternative to the 6.0L engine.  Defendant had a duty to disclose this to Plaintiff because Defendant represented to Plaintiff that Defendant projected Plaintiff would profit $9,135,000.00 for the supply of 6.0L engine components.  Defendant's representation to Plaintiff of Plaintiff's projected profits created a substantially false impression imposing a duty upon Defendant to disclose that it was going to experience

significantly reduced sales of the 6.0L engine sales since Freightliner was sourcing a 6.6L engine directly from GM as the alternative to the 6.0L engine.

40.    Defendant had a duty to disclose that Freightliner has never and will never purchase engines other than those supplied by GM or a GM designated third party manufacturer.  Defendant represented to Plaintiff that Defendant contracted with Plaintiff to design and develop a replacement for GM's 6.0L engine.   Defendant represented to Plaintiff that Defendant projected Plaintiff would profit $9,135,000.00 for the supply of 6.0L engine components.  Freightliner was Defendant's customer that purchased the vast majority of 6.0L engines sold by Defendant. Defendant's representations created a substantially false impression imposing a duty upon Defendant to disclose that Freightliner has never and will never purchase engines other than those supplied by GM or a GM designated third party manufacturer.

41.    Defendant had a duty to disclose to Plaintiff that Defendant must source the 6.0L replacement engine from a GM designated third party manufacturer.  Defendant represented to Plaintiff that Defendant contracted with Plaintiff to design and develop a replacement for GM's 6.0L engine.   Defendant represented to Plaintiff that Defendant projected Plaintiff would profit $9,135,000.00 for the supply of 6.0L engine components.  Defendant's representations created a substantially false impression imposing a duty upon Defendant to disclose that Defendant would be sourcing the 6.0L replacement engine from the GM third party manufacturer, AER.

42.    The facts concealed by Defendant were material.  The facts concealed by Defendant were material because each fact would have been significantly important to Plaintiff in making the decision to accept the Engineering Services and Supply Agreement as consideration for entering into the settlement agreement.  Had Plaintiff known of any of the above facts concealed by Defendant, Plaintiff would not have accepted the Engineering Services and Supply Agreement as

consideration for entering into the Settlement Agreement.  Had any of the above concealed facts been disclosed to Plaintiff, Plaintiff would have known that the Engineering Services and Supply Agreement had little to no monetary value to Plaintiff.

43.    Defendant knew that Plaintiff was ignorant of the concealed material facts and did not have an equal opportunity to discover the truth.    At the time Plaintiff entered into the Settlement Agreement and accepted the Engineering Services and Supply Agreement as consideration, Defendant knew that Plaintiff was unaware of the concealed material facts. Defendant also knew that there was no source in which Plaintiff could have relied on to discover the truth.  The only source of information that Plaintiff could have relied on was Defendant. Plaintiff did not learn of the concealed material facts until 2023.  The true reason for Defendant anticipating significantly reduced sales of the 6.0L engine was a material fact only known to Defendant in July 2021, and Plaintiff had no means of discovering this truth from any source other than Defendant.  The fact that Freightliner has never and will never purchase engines other than those supplied by GM, or a GM designated third party manufacturer, was a material fact only known to Defendant and Freightliner.  Plaintiff had no knowledge of this fact until Mr. Xykis, disclosed this information to Mr. Mast during an April 2023 telephone conversation.  In fact, during that same conversation, Mr. Xykis stated to Mr. Mast that "what [Defendant] does with [Freightliner] is nobody's business but [Defendant's] and [Freightliner's]".    Finally, the fact Defendant must source the 6.0L replacement engine from the GM third party manufacturer, AER, was a fact only known to Defendant, GM, and AER.  This fact was not made public until after Plaintiff and Defendant entered into the Engineering Services and Supply Agreement and Plaintiff had no means of learning of this truth from any source other than Defendant.

44.     Defendant deliberately remained silent and did not disclose the material facts to Plaintiff.  Defendant deliberately concealed the material facts because Defendant knew that Plaintiff would never accept the Engineering Services and Supply Agreement as consideration for entering into the Settlement Agreement had these material facts been disclosed to Plaintiff. Defendant knew that the Engineering Services and Supply Agreement was critical to the resolution of the 2021 Arbitration and that if Defendant concealed the material facts from Plaintiff, Plaintiff would be incentivized to accept the Engineering Services and Supply Agreement as consideration for the settlement, and in exchange, Defendant would not have to pay Plaintiff for the unpaid royalties nor would Defendant have to pay Plaintiff future royalties as they became due.

45.     By deliberately remaining silent, Defendant intended for Plaintiff to act without the information.  More specifically, Defendant intended for Plaintiff to enter into the Settlement Agreement.  Again, Defendant knew that remaining silent was critical to convincing Plaintiff to accept the settlement proposal.  Plaintiff would have never accepted the Engineering Services and Supply Agreement as consideration for the settlement had Defendant not deliberately remained silent.

## F.  <u>COUNT 3—BREACH OF SETTLEMENT AGREEMENT</u>

46.     In the alternative to the other counts, Plaintiff sues Defendant for breach of the Settlement Agreement.

47.     On July 27, 2021, Plaintiff and Defendant entered into the Settlement Agreement. As consideration for entering into the Settlement Agreement, Defendant agreed to enter into the Engineering Services and Supply Agreement and the Amendment of the 2011 Supply Agreement. Contemporaneous with the execution of the Settlement Agreement, Plaintiff and Defendant

entered into the Engineering Services and Supply Agreement and the Amendment of the 2011 Supply Agreement.  The Engineering Services and Supply Agreement and the Amendment of the 2011 Supply Agreement were made part of, and fully incorporated into, the Settlement Agreement.

48.    Paragraph "D." of the Engineering Services and Supply Agreement states [Defendant] desires to develop and produce at least two new engines, and variants of those engines…."  Defendant at no point made any effort to work with Plaintiff in order to develop and produce a single engine.

49.    Paragraph "3(a)" of the Engineering Services and Supply Agreement states "[t]he Parties shall act in good faith to establish timelines for each of the Milestones within 28 days of the execution of this Agreement."  Defendant never participated in any good faith efforts to establish timelines for each Milestone.  As a result, not a single Milestone has been reached.

50.    Paragraph "5(b)" of the Engineering Services and Supply Agreement states "[Defendant] shall exclusively….negotiate with [Plaintiff] for the supply of the Engines commencing on the date of this Agreement and for a period of six months thereafter."  Not only did Defendant make zero efforts to develop the engines with Plaintiff, but Defendant breached this clause of the Engineering Services and Supply Agreement as Defendant was negotiating the sourcing the 6.0L engine from a GM third-party supplier before the end of 2021 as confirmed by Defendant's fiscal year 2021 10k.  The Engineering Services and Supply Agreement was entered into in July 2021; thus, there were less than six months remaining in the year.  Because Defendant began negotiating and/or sourcing the 6.0L engine from another source during 2021, Defendant is in breach of this clause.

51.     Paragraph "11(a)" of the Engineering Services and Supply Agreement provides that "[t]he Parties agree to act in good faith to develop the Engines under the Program…."  Defendant is in breach of this provision as Defendant has made zero efforts to develop a single engine under the program.  Defendant was immediately negotiating the 6.0L engine from another source without discussing the sourcing of the engine with Plaintiff.  Defendant never responded to any budget submissions made by Plaintiff, and as a result, Plaintiff was never able to commence the first milestone.

52.     Paragraph "11(a)" further provides "[t]he Parties…agree not to voluntarily terminate this Agreement subject to the provisions below without consultation and good-faith negotiations among the Parties to resolve any deficiencies prior to any proposed termination and to explore alternatives to termination, including but not limited to jointly pursuing other development opportunities in the market."  Defendant terminated the Engineering Services and Supply Agreement on May 18, 2023.  Prior to Defendant's termination of the Engineering Services and Supply Agreement, Defendant made no effort to consult with Plaintiff or have good faith negotiations "to explore alternatives to termination".

53.     Defendant's termination of the Engineering Services and Supply Agreement was a "termination for convenience" as defined in paragraph "11(a)".  Because the termination was a "termination for convenience", Defendant was required to pay Plaintiff $900,000.00 under Paragraph "12".  Defendant has failed to pay Plaintiff $900,000.00 as required under Paragraph "12".

54.     Defendant has intentionally breached the Engineering Services and Supply Agreement which was the consideration supporting the Settlement Agreement.  Defendant's

breach of the Engineering Services and Supply Agreement results in a direct breach of the Settlement Agreement.

55.     Additionally, Defendant has expressed its intent of repudiating the Amendment of the 2011 Supply Agreement by purchasing 1,770 fewer manifolds than Defendant is required to purchase under the Amendment of the 2011 Supply Agreement.  Defendant's anticipatory repudiation of the Amendment of the 2011 Supply Agreement is a direct anticipatory repudiation of the Settlement Agreement.

56.     As a direct and proximate result of Defendant's breach of the Settlement Agreement, Plaintiff has sustained damages as more fully described in paragraphs below.

## G.  **DAMAGES**

57.     Plaintiff would show that all of the aforementioned acts, taken together, or singularly, constitute the proximate and producing causes of the damages sustained by Plaintiff.

58.     For common law fraud, fraudulent inducement, and fraud by nondisclosure, Plaintiff is entitled to recover the following damages:

    a.  Actual damages;

    b.  Direct damages;

    c.  Reliance damages,

    d.  Incidental damages;

    e.  Consequential damages;

    f.  Out-of-pocket losses;

    g.  Statutory additional damages;

h.  Benefit of the bargain damages;

i.  Exemplary damages;

j.  Costs of court; and

k.  Pre- and post-judgment interest.

59.    Plaintiff is additionally entitled to the equitable remedy of recission of the Settlement Agreement that is marred by fraud.

60.    For Plaintiff's alternative cause of action for Breach of Settlement Agreement, Plaintiff is entitled to recover the following damages:

a.  Benefit of the bargain damages;

b.  Liquidated damages;

c.  Reliance damages;

d.  Attorney fees;

e.  Costs of court; and

f.  Pre- and post-judgment interest.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, that upon final trial hereof, Plaintiff recover against Defendant all of Plaintiff's damages as set forth herein as well as Plaintiff's reasonable and necessary attorney fees, pre- and post-judgment interest at the legal and lawful rate, all costs of court, and all other and further relief, at law or in equity.

Respectfully submitted,

**THE FERGUSON LAW FIRM, LLP**

By: */s/ Paul "Chip" Ferguson, Jr.*
Paul "Chip" Ferguson, Jr.
State Bar No. 06919200
Harrison E. Tatum
State Bar No. 24103961
3155 Executive Boulevard
Beaumont, Texas 77705
Telephone: (409) 832-9700
Facsimile: (409) 832-9708
E-mail: cferguson@thefergusonlawfirm.com
          htatum@thefergusonlawfirm.com

And

**CLARDY LAW OFFICE**
Travis Clardy
State Bar No. 04268020
209 E. Main St.
Nacogdoches, Texas 75961
Telephone: (936) 564-2500
E-mail:  travis@clardy-law.com

And

**BANKER PHARES, ATTORNEY AT LAW**
H. Banker Phares
State Bar No. 15897000
8141 Gladys Ave., Ste. 102
Beaumont, Texas 77706
Telephone:  (409) 866-2626
Facsimile:  (409) 866-2642
E-mail:  gina@phareslawfirm.com

**ATTORNEYS FOR PLAINTIFF,
MAST POWERTRAIN, LLC**