# EXHIBIT "2"

# THE 2011 ENGINE DEVELOPMENT AGREEMENT

**<u>NOTICE:  THIS  AGREEMENT  CONTAINS  BINDING  ARBITRATION
PROVISIONS</u>**

<u>AGREEMENT</u>

This Agreement ("Agreement") is entered into by and between Mast
Powertrain, LLC ("Mast") and Power Solutions International, Inc ("PSI").
The terms and conditions of this Agreement are supported by good and
valuable consideration, the receipt and sufficiency of which is hereby
acknowledged.

<u>Introduction</u>

Mast and PSI are creating this Agreement for the purpose of jointly
designing and developing a global engine family platform ("GEP") to fulfill
the continuing needs of the industrial, marine, truck and bus market.
The project goals are to: 1) Provide a broad range of "drop in" engine
options to current clients; 2) Have minimal impact on customer
packaging and integration; 3) Manufacture at comparable or less cost of
Horsepower/Kw per dollar than competitors; and 4) Integrate
technologies that provide a competitive advantage over market
competition.  The products ("Products") covered by this Agreement
include a: 1) 2.0/3.4L I4 Platform; 2) a 4.6/5.0L V6 Platform; and 3) a
6.7L V8 Platform; by way of clarification, the Products also include the
"Product Components" as defined.  There is a fourth Product – a 2.5L I3
Platform - under consideration, and which may be included at a future
date but which is not presently included in the Agreement.

*HM  GSW*

<u>Terms and Conditions</u>

THEREFORE KNOW ALL PERSONS BY THESE PRESENTS THAT Mast and PSI now contract and agree as follows:

1. <u>Development Responsibilities and Intellectual Ownership and Compensation</u>.

(a)    <u>Development Responsibilities.</u>    Mast has primary responsibility for the design, development, validation, and prototyping the Products from the design stage to the prototype stage, through production release, testing, engineering, and ongoing review for the Engines (the "Mast Development Services"). Mast will own tooling and fixtures associated with Mast Manufacturing Services as discussed in a later paragraph of this Agreement.

PSI will provide necessary design, engineering, prototyping, and component sourcing support together with specified upfront funding. PSI will own tooling and fixtures ("Production Tooling") associated with engine blocks and heads (<u>i.e.</u>, the Mast Machined Components).

(b)    <u>Joint Intellectual Property.</u>    Due to the fact that this is a joint project, intellectual content and input will be provided from both Mast and PSI; therefore, all intellectual property with respect to the Products (the "Intellectual Property") will be equally and jointly owned by Mast and PSI.  The parties acknowledge and agree that the "Intellectual Property" will consist of (a) the base engine architectures, (b) the blocks

#M  GSW

and the heads (i.e., Mast Machined Components), (c) Product Components that are unique to the Products, and (d) any other items that the parties agree in Good Faith and in writing are part of the Intellectual Property.  The Intellectual Property as agreed to will include drawings and may include the formulations, methods, procedures, processes, techniques, designs, trade secrets, software (including source code/object code), know how and all other confidential or proprietary information incorporated into such items, as well as patents and patent applications with respect to the foregoing.

(c)    <u>Mast Exclusive Use of Intellectual Property.</u>  Mast shall be the exclusive user of all Intellectual Property even as to PSI for all Products used in High Performance Marine and High Performance Automotive applications along with any Products used in programs associated with federal government agencies such as the United States Postal Service (the "Mast Markets").  If agreed to at a later date in writing, Mast shall also assume commercial lead relative to specialty Marine applications such as airboat and 500 Horsepower and above marine applications and these will also be included in the "Mast Markets."

(d)    <u>PSI Exclusive Use of Intellectual Property.</u>  PSI shall be the exclusive user of all Intellectual Property even as to Mast for all Products used in all applications other than those reserved for Mast in the Mast Market, including Products used in Industrial (which includes off-Highway), Marine and on-Highway applications (the "PSI Markets").

*HM*    *GSW*

(e)    <u>Royalties, etc.</u> With respect to compensation for profit received for Intellectual Property, Mast shall receive one hundred percent of any such profit derived from the sale of Products associated with applications for which Mast holds exclusivity of Intellectual Property including High Performance Marine and High Performance Automotive applications along with any programs associated with federal governments agencies, such as the United States Postal Service, or which Mast has the commercial lead (in other words, those in the "Mast Markets"). Royalty payments only apply when there is a sale of a long block engine, but not merely sale of components.

(f)    <u>Future Mast Opportunities.</u> The parties agree that Mast may, but except for section 1(g) is not required to, bring opportunities from time to time in the Mast Market for which Mast will be the commercial lead. If Mast brings these opportunities to PSI, PSI agrees to provide commercially reasonable support to Mast and will assist Mast in pursuing and executing these opportunities ("Future Mast Opportunities"). The parties agree that PSI may provide developmental support and may become the exclusive manufacturer of Products in these Future Mast Opportunities if agreed to by the parties in Good Faith. The parties agree that Products and services they provide for these Future Mast Opportunities will be provided on a commercially reasonable basis and will be negotiated in Good Faith (as defined) by the Parties.

(g)    <u>PSI    Exclusive    Manufacturer.</u>    Notwithstanding section 1(f) above, PSI shall be the exclusive manufacturer for Mast of all Products (including Future Mast Opportunities) used by federal government agencies, such as the United States Postal Service, but PSI shall not receive any compensation for Intellectual Property profit (<u>i.e.,</u> a royalty) associated therewith.

Mast, at a later date, has the option of using PSI for the manufacture of Products used in High Performance Marine and High Performance Automotive applications.  PSI, at a later date, has the option of manufacturing Products associated with specialty Performance Marine applications, such as airboat and 500 Horsepower and above marine applications, as well as other Future Mast Opportunities as noted above. However, with respect to the option of Mast and/or the option of PSI as set forth above in this paragraph, Mast will assume the commercial lead, and PSI shall not receive any compensation for Intellectual Property profit associated therewith.

The parties acknowledge, however, that PSI will be entitled to the manufacturing profit for these Products as set forth in this Agreement.

2. <u>Development Services; Funding for Development</u>. Mast shall provide all of its development, engineering, and prototyping services associated with this Agreement at Mast's cost.  The parties have agreed to a preliminary budget for such Mast Development Services which is to

HM  GSW

be attached as <u>Exhibit A.</u>  This exhibit also sets forth a timeline and deliverables for the Mast Development Services.  Mast shall submit for payment to PSI detailed invoices every two weeks for the development, engineering, and prototyping services (<u>i.e.,</u> Mast Development Services) associated with the Agreement.  PSI shall, by wire transfer, pay all undisputed invoice amounts within five business days of receipt of the invoice.  If there is a dispute regarding an invoice, Mast and PSI shall use Good Faith efforts in an expeditious time frame to resolve the dispute, but in no case shall PSI withhold payment of any amounts that are not in dispute, even if such amounts appear on an invoice with a mixture of disputed and undisputed requests for payment.

PSI shall provide upfront funding, on a draw down as needed basis pursuant to the budget, to cover Mast's costs of development, engineering, and prototyping, along with the cost of Production Tooling (which shall be owned solely by PSI) in amounts not to exceed: a) 2.0/3.4L I4 Platform Cost, $1,071,880; b) 4.6/5.0L V6 Platform Cost, $918,040; and c) 6.7L V8 Platform Cost, $607,160.  Therefore, the estimated Total for the above 3 applications GEP cost is $2,597,080, but is subject to Good Faith adjustment through mutual agreement of Mast and PSI.

     3.   <u>General Duties of the Parties.</u>

     (a)   <u>General.</u>  The parties acknowledge and agree that Mast will have duties under this Agreement both during the prototype

development stage as well as during the production stage of the Products. Similarly, PSI will have duties during the development stage as well as the production stage for the Products. Both of the parties shall share fully in the Intellectual Property used or developed with respect to the Products, and each of the parties shall be provided with complete sets of drawings and other Intellectual Property with respect to the Products as may be necessary to allow a party to fully use the Intellectual Property.

(b)   Mast Duties and Responsibilities.   In addition to specific duties set forth in this Agreement, the general duties and responsibilities of Mast include:

(i)   Meeting on-time delivery requirements,

(ii)   Meeting quality standards as determined in good Faith,

(iii)   Complying with the terms and conditions applicable to Mast as described subsection (d) below,

(iv)   Designing Products that can be manufactured at comparable or less cost of Horsepower/KW per dollars than Products that are competitive with the Products;

(v)   Maintaining Products so as to remain technologically current or superior;

(vi)   Protecting jointly owned Intellectual Property;

HM  OSW

(vi)    Maintaining Good Faith efforts through mutual agreement with PSI; and

(vii)    Compensating PSI on a timely basis for Products manufactured by PSI for Mast.

(c)    <u>PSI Duties and Responsibilities.</u>

(i)    Meeting on time delivery requirements;

(ii)    Meeting quality standards as determined in Good Faith;

(iii)    Complying with the terms and conditions applicable to PSI described in subsection (d) below;

(iv)    PSI will compensate Mast on a timely basis for development, engineering and prototyping services, as well as all other Mast Development Services or Mast Manufacturing Services;

(v)    Payment on a timely basis of Mast's royalties and other payments, as set forth;

(vi)    Protecting jointly owned Intellectual Property;

(vii)    Providing engineering and support services as specified.

(viii)    Maintaining Good Faith efforts through mutual agreement with Mast.

(d)    <u>Terms and Conditions.</u>    The parties acknowledge and agree that each of the parties will be providing Products and Services to the other party throughout the term of this Agreement. Therefore, the

*HM    GSW*

parties acknowledge and agree that they will negotiate in Good Faith terms and conditions that will apply on the provision of Products and services by each of the parties. Once these terms and conditions have been negotiated, they will become an attachment to this Agreement and will be incorporated entirely into this Agreement and will be duties of the Parties as set forth therein. The Parties agree to negotiate the terms and conditions and the Good Faith as quickly as possible following the signing of this Agreement. The Parties acknowledge and agree the Terms and Conditions will be bi-directional and cover the following items:

- Forecasting

- Shipping/Delivery

- Insurance

- Warranty

- Force Majeure

- Indemnity

- Quality/Returns

- Taxes and Duties

- Tooling/Fixture Maintenance

4. <u>Manufacturing and Supply.</u>

(a)    <u>Mast Manufacturing Services.</u>  After the production release of the Products, the Products contemplated by the Development portion of this Agreement will be exclusively manufactured and supplied by PSI. Mast shall supply machining services which are referred to as

HM GSW

"Mast Manufacturing Services" for components, consisting of machined engine blocks and machined cylinder heads ("Mast Machined Components") integrated into the Products on an exclusive basis. Thus, PSI must use Mast exclusively for these Mast Manufacturing Services for the Mast Machined Components unless Mast fails to provide these as set forth in section 3(b) after the applicable cure period in section 6. There may be other items added in the future to the list of Product Components for Mast Manufacturing Services as agreed to by PSI and Mast. PSI and Mast also agree that additional items could include components outside of the Products covered by this agreement (i.e., "Dressed Components"). Any Dressed Components or additional Standard Components would be governed by this Agreement, including the terms and conditions of sale.

The Product Components consist of (a) the Mast Machined Components and (b) the Standard Components. The "Standard Components" are subcomponents (other than the Mast Machined Components defined above) contained in base engines as currently received by PSI from existing engine suppliers on industrial engines (i.e., on GM industrial long blocks). The parties will share equally any Intellectual Property with respect to the Product Components. PSI will own all tooling and fixtures with respect to the Product Components. "Dressed Components" shall mean components other than Product Components that OEMs may require or specify for engines supplied to them. The parties will determine in Good Faith

HM  GSW

which, if any, Dressed Components will be subject to Mast Manufacturing Services.

There will be investments by PSI and Mast associated with the manufacture and supply of the Products. PSI shall be solely responsible for procuring and financing, and shall own all Product Components for which Mast Manufacturing Services described in subparagraph (a) above are performed and all the Intellectual Property for the Dressed Components shall belong to PSI.

(b)    Quality Systems; Attachment.    In a separate attachment (Attachment C), Mast and PSI shall define "normal operating conditions" and set forth documented quality systems which will apply bi-directionally.   If any quality issue occurs that are outside normal operating conditions, then the party in breach shall reimburse the other party with the cost associated therewith.

(c)    Production Tooling.   Whenever production tooling and fixtures ("Production Tooling") are involved, PSI will pay any such amounts direct to the manufacturer or supplier of such Production Tooling. The payment for Production Tooling is subject to PSI's normal approval processes as PSI, in its sole discretion determines, including PSI's specified PPAP requirements.  Where an outside third party vendor is used to produce Production Tooling, such third party vendor shall execute and deliver any and all Confidentiality Agreements and Development Agreements that PSI may require to have such party

HM GSW

acknowledge that the Intellectual Property used in or produced for manufacturing such Production Tooling is the property of PSI.

        (d)    <u>Certification Services.</u>  Upon prior written approval from PSI, Mast may provide application or certification services to PSI, in which case such services shall be provided at cost plus a margin determined in Good Faith between Mast and PSI.

        (e)    <u>PSI Engineering.</u>  PSI will provide all of its developmental, engineering, and prototyping services associated with this Agreement at cost.

        (f)    <u>Mast Capital Equipment.</u>  Mast shall be solely responsible for, and shall own, any capital equipment purchased or leased by Mast required to support Mast Manufacturing Services (<u>i.e.,</u> equipment and tooling used in the Mast machining operations).

5. <u>Pricing for Mast Manufacturing Services, Amortization, and Internal Pricing</u>.

        (a)    <u>Mast Manufacturing Services.</u>  Pricing for Mast Manufacturing Services (as above defined) supplied to PSI shall be equal to actual cost (including amortization charges) plus a margin of not less than 5% nor more than 15%. The margin shall be determined in Good Faith between Mast and PSI, however the initial target margin to Mast is expected to be 10%.

        (b)    <u>Amortization.</u>  Mast and PSI shall, by separate attachment to this Agreement, incorporate an amortization charge

*HM*    *CSW*

pertaining into any pricing or costing incurred by either Mast or PSI, which are associated with capital equipment or tooling expenditures for Mast Manufacturing Services, or which are associated with the sale or transfer of Product Components or Products between the Parties or with the calculation of Royalty Payments (discussed in a later paragraph) due to Mast.

(c)    Internal Transfer Product Price.    However, when Products are supplied to Mast by PSI, the pricing shall be determined as follows: Such an event will produce an "Internal Transfer Product Price" as discussed in a later paragraph of this Agreement. The pricing shall be the Internal Transfer Product Price (as later defined) plus the actual cost of any Dress Components including a fifteen percent margin; (i.e. actual cost/.85) plus actual labor hours associated with the Dress Components times a labor and overhead rate of $65.00; e.g., the charge to the United States Postal Service product would be $1,475.00-$1,550.00 plus the actual cost of Dress Components/.85 plus actual labor hours associated with dress components times $65.00 an hour. Royalty payments to Mast shall not be paid with respect to Products which are transferred back to Mast.

(d)    Labor Rate Calculation.    The parties acknowledge and agree that since the term of this Agreement is ten years, they will negotiate in Good Faith changes to the labor rates under this Agreement applicable to both parties in the event the Consumer Price Index published by the

HM    CSco

Bureau of Labor Statistics, U.S. Department of Labor ("CPI")_ (Chicago, Illinois) increases or decreases by more than five percentage points from the CPI as of the date of this Agreement. The parties agree that in negotiating changes to labor rates in Good Faith, they understand that the Products must be price competitive and this will be a primary concern in the Good Faith negotiations. This section is bi-directional. The parties acknowledge that they may have one or more Good Faith negotiations over the change of labor rates in the event there are additional increases in the Consumer Price Index (Chicago, Illinois) during the term of this Agreement.

6. <u>Royalties</u>.

a.   <u>Mast Royalty for Internal Transferred Products.</u>   For Products sold by PSI to end users in Industrial applications ("Internal Transferred Products"), Mast shall receive a royalty payment equal to fifty percent of the profit as calculated between the actual cost of production of the Products and the following agreed Internal Transferred Product Price. The Internal Transfer Product prices are as follows: a) 2.0/3.4L Platform, (range $1,475.00 to $1,550); b) 4.6L/5.0L V6 Platform, (range $1,875.00 to $1,925); and c) 6.7 V8 Platform (range $2,100 to  $2,250). All amounts in this paragraph shall be agreed upon in Good Faith and subject to Good Faith adjustment through mutual agreement of Mast and PSI.

The actual cost of production is defined as actual material cost plus freight to PSI's manufacturing facilities, plus the cost of any Mast Manufacturing Services including margin, plus a PSI labor and overhead charge at a labor and overhead rate determined in Good Faith through mutual agreement of Mast and PSI, but not less than $45.00 an hour, times a maximum of 4 hours for the 2.0/3.4L I4 Platform, 4.5 hours for the 4.6/5.0L V6 Platform, and 5 hours for the 6.7L V8 Platform.  Should the above formula produce a loss, Mast and PSI shall work together to reduce actual costs so as generate profits without impairing quality.

The royalty payment to Mast shall be reduced by any margin that Mast receives for Mast Manufacturing Services into the Internal Transferred Products; provided, however, that Mast shall not be required to reimburse PSI for any royalty payment that is less than zero produced as a result of Mast Manufacturing Services.

Any royalty payment shall also take into account the recapture, by PSI, of funding for development and Production Tooling. This shall be factored against any royalty payment due to Mast through an amortization factor, contemplated in the PSI labor and overhead rate as earlier noted.  The parties shall agree in Good Faith to the applicable recapture/amortization factor.

b.    Other Applications.  For Products sold by PSI to end users in all applications (other than Internal Transferred Products), Mast

HM CSW

shall receive a royalty payment equal to a percent of the net selling price of the Products to the end customer. The royalty shall be determined in Good Faith between Mast and PSI on a case by case basis but in no case shall the royalty be less than 3% nor more than 5%.

When PSI supplies Dressed Components or other services; i.e. dressing services, to customers beyond the Product Components and services associated with the base Product, and where the selling price for the Product cannot be easily differentiated from the total selling price of the Dressed Components/dressing services, the parties shall use Good Faith efforts to establish the appropriate royalty due Mast based upon the estimated selling price of the Product on a free standing basis. In way of clarification, it is the parties intent that Mast receive a royalty only on the portion of the total "Dressed" Product price that is representative of the price of the Product had the Product been sold without any additional Dressed Components or dressing services and that Mast will not receive a royalty for any Dressed Components or dressing services that are not a part of the Product as independently sold.

    c.   <u>Payment Due Date.</u>  Royalty payments shall be calculated each calendar quarter, and paid by the 15th day of the following calendar quarter.

    d.   <u>Noncompete Period.</u> The parties acknowledge that the royalty payments shall accrue and be paid during the term of this Agreement, and for as long as Mast does not compete (as described in

HM GSW

section 13) by providing any Products or any products which are substitutes for the Products in the PSI Market following termination for as long as the maximum term allowed by law. Thus, PSI's obligations to pay any royalties to Mast terminate if Mast provides any Products or any substitutes for the Products in the PSI Markets following termination.

7. Duration of Agreement: The duration of this Agreement is ten years from the date above, unless it is earlier terminated by mutual agreement or by an uncured breach by a party. (With respect to the joint ownership of the Intellectual Property, it shall remain in effect for the maximum terms allowed under law for the ownership of such property. With respect to royalty payments, it shall remain in effect during the term of this Agreement and as long as Mast does not compete by providing any Products or any substitutes for the Products in the PSI Markets (as described in section 13), for as long as the maximum term allowed by law. If one party believes the other party has breached the Agreement, then the party who believes there is a breach shall notify the other party, in writing, of the specific breach, and the party accused of a breach shall have  ninety calendar days to cure the breach in order to avoid termination of the Agreement.  However, the cure period for payment breaches shall be thirty days. If the breaching party fails to cure the breach within such 90-day period (or thirty day period for payment breaches), then the non-breaching party may terminate this Agreement.  Upon termination of this Agreement, all undisputed

amounts will be become due and payable between the parties. The parties will cooperate in all respects in providing the other party documents necessary for a party to utilize the Intellectual Property. In addition, the parties acknowledge that termination or expiration of this Agreement shall not affect the rights and obligations that may have accrued to either party under this Agreement prior to the date of termination or expiration.

8. <u>Good Faith Efforts</u>: Mast and PSI understand that mutual agreement will be necessary to determine the following associated with this Agreement: a) Mast's costs to provide all of its development, engineering, and prototyping services, b) Mast's costs of development, engineering, and prototyping, along with the cost of Production Tooling for the 3 GEP applications, c) Mast provided application or certification services, d) PSI's cost to provide developmental, engineering, and prototyping services, e) Mast Services cost including amortization charges and margin, f) Internal Transfer Product prices, g) PSI's labor and overhead rate, h) actual cost of production for the 3 GEP applications, i) royalty payment due to Mast for products sold by PSI to end users, j) royalty payment due to Mast when PSI supplies Dressed Components or dressing services to customers where the selling price for the Product cannot be easily differentiated from the total selling price of the Dressed Components or dressing services and (k) other matters discussed in this Agreement where Good Faith or Good Faith efforts are

HM GSW

specified.  In the event the parties are unable to reach agreement on any of the matters requiring either Good Faith negotiation or Good Faith agreement, or in the event a dispute arises between the Parties, the Parties shall submit the matter to the Chief Executive Officers of the parties.   The Chief Executive Officers of the parties shall then take commercially reasonable actions over a reasonable period of time to resolve any disputes and reach an agreement on such matter.  Similarly, if the parties disagree on other matters in this Agreement where Good Faith is not specified, including whether there has been a breach of agreement, they shall similarly have the matters addressed by the Chief Executive Officers of each of the Parties.  Only after Good Faith efforts to resolve such matter fails may a party bring such matter to binding arbitration in accordance with section 9 of this Agreement.

9. <u>Relationship of the Parties and Binding Arbitration:</u>  The parties understand that their mutual cooperation is necessary to the success of this Agreement, and the parties recognize that this Agreement is contractual in nature, and does not thereby cause them to be associated in a partnership, joint venture, or other entity; however, the parties do recognize the differences and/or disputes may develop and therefore agree to binding arbitration after the dispute mediation process in section 8 fails. If any question of interpretation or dispute arises between the Parties with respect to this Agreement, the parties agree to submit to binding arbitration at a mutually agreeable location in Illinois.   The

procedure shall be as follows: the party requesting arbitration shall submit the matter to the other party in writing. Within ten days of the receipt of the submission, the parties shall negotiate in Good Faith the identity of an arbitrator, such as a retired judge, to act as the single arbitrator for such matter. If they are unable to agree upon an arbitrator within such time frame, then each party shall select one arbitrator. Within ten days of their selection, the two arbitrators so selected shall select a third arbitrator.   Should a party fail or refuse to select an arbitrator, the arbitrators that have been appointed shall select an arbitrator. The three arbitrators shall then consider the matter within thirty days of the selection of the third arbitrator and the arbitrator (or arbitrators, as the case may be) shall, within ten days of the last day of the arbitration proceeding, render a decision which shall be final, binding and conclusive on both parties; and enforceable in a court of competent jurisdiction.  Any decision by the arbitrator(s) shall be by a majority vote and shall be final.  The arbitrator(s) shall establish the rules of procedure and evidence that must be followed by the parties with respect to the arbitration, but shall do so with the goal of resolving the matter as quickly and efficiently as possible.  Illinois law shall govern the terms of this Agreement.  The arbitrator(s) may select legal counsel to advise them in matters concerning the arbitration.   The arbitrators may elect to conduct the arbitration by telephone in order to save expense.   The losing party shall pay for all costs attributable to the arbitration.   If

neither party's position is fully upheld by the arbitrators, each party shall pay one-half of the expense of the arbitration.   During the arbitration process, there will be no termination of this Agreement.

11.   <u>Intellectual Property</u>.   The parties acknowledge that jointly owned Intellectual Property consists of Intellectual Property with respect to the Products developed by the parties pursuant to this Agreement.   In the event a party undertakes efforts to develop the Products and utilizes third party providers, such party shall take actions as may be necessary or appropriate with third party vendors and service providers to make sure that any and all Intellectual Property is owned jointly and exclusively by the Parties to this Agreement, and that no such third party has any Intellectual Property Rights with respect to such Intellectual Property.   The parties shall determine in Good Faith whether any Intellectual Property developed by a party or the parties in connection with this Agreement is potentially patentable.   In such case, the parties will work together in Good Faith to determine whether to seek patent protection for such innovation.   If one party declines to seek patent protection for any Intellectual Property, the other party may nonetheless seek such Intellectual Property protection, and both of the parties shall cooperate fully in assisting in preparing the patent application and throughout the patent process.   Unless a Party declines ownership of patent rights, the parties shall share the cost of patent prosecution equally.   In the event any of the Intellectual Property is patented and

*HM*   *GSW*

jointly owned, the parties will work together in Good Faith for determining an Intellectual Property protection strategy, including an enforcement strategy.   Further, the Parties will work together in good faith to make sure that none of the Products infringe upon the Intellectual Property Rights of third parties.   A party who bears responsibility for designing any Product or any Product Component shall take primary responsibility for making sure that none of the Products or Product Components, as the case may be, infringe upon the intellectual property rights of third parties.  The terms and conditions will set forth provisions for indemnification in the event there is actual or alleged infringement of intellectual property rights of third parties.  Finally, the Parties acknowledge and agree that they intend to continue to develop and improve the Products during the term of this Agreement.   Any Intellectual Property that the parties bring for the Products, as well as any and all newly developed Intellectual Property with respect to the Products whether in connection with the obligations set forth above or further development of the Products following the beginning of this Agreement will be subject to the Intellectual Property Rights provisions and protections of this Agreement.   As noted, each of the Parties will have exclusive rights to the Intellectual Property in their markets – Mast will have the exclusive right to use the Intellectual Property in the Mast Markets for the Products, and PSI will have the exclusive right to use the Intellectual Property in the PSI Markets for the Products.   These

exclusive rights shall survive the termination of this Agreement in perpetuity. Neither party may assign or sublicense any of their Intellectual Property Rights to any party unless such party acknowledges and agrees in writing that they have no right and they shall not provide any Products in or to the other party's market.

12. Right of First Refusal. During the term of this Agreement, Mast shall provide written notice to PSI of any offer from a third party to acquire, merge with or otherwise combine all or substantial all of the business of Mast, and will provide PSI with the identity of the potential buyer, the price, the payment terms and other terms and conditions of such proposed sale, including without limitation, any proposed sale contracts (collectively, the "Purchase Information"). PSI shall then have 45 days after receipt of the Purchase Information to notify Mast in writing whether PSI wishes to exercise its right under this section to make an offer at $1.00 more than the price offered by the third party and on substantially the same terms and conditions as the third party's offer, and thereby acquire Mast's business. If PSI notifies Mast that within such 45 day period that PSI is exercising its right of refusal hereunder, the parties shall proceed with the sale of Mast's business to PSI at the purchase price stipulated in the last offer for Mast and otherwise upon the terms and conditions set forth in the Purchase Information. If PSI waives its right of first refusal, then Mast is free thereafter to pursue the sale of Mast and its business to any third party and to close such sale

#M  GSW

within six months after the expiration of the 45-day period; provided, however, the terms of such proposed sale, including financial and non-financial considerations and rights granted, if any, taken as a whole, may not be less favorable than those last offered in writing by PSI to Mast.  If a sale is not consummated within such six-month period, any subsequent potential sale shall thereafter be subject to the right of first refusal.  In the event a party offers Mast non-cash consideration (i.e., the stock of such party), the purchase price shall be determined as a function of the average trading price of such stock of the proposed buyer of Mast during the one-year period preceding the sale.  PSI shall then be entitled to make an offer for the cash equivalent per share, one year average price per share of such stock multiplied by the number of shares to be exchanged in any such purchase.

13.    Noncompetition Provisions.    During the term of this Agreement (the "Noncompete Period"), the parties agree as follows:

(a)    PSI shall not, during the Noncompete Period, directly or indirectly, provide any products that compete with or are substitute for the Products to or on behalf of any third party in any of the Mast Markets.  Further, during the Noncompete Period, PSI shall not provide to any such third party any components that are competitive with the Product Components for use by any third party in the Mast Markets.

(b)    During the Noncompete Period, Mast shall not provide any Products or Mast Manufacturing Services that compete with or are

HM GSW

substitutes for the Products to or on behalf of any third party in any of the PSI Markets. Further, during the Noncompete Period, Mast shall not provide to any third party any components that are competitive with the Product Components for use by such third party in the PSI Markets.

(c)    The parties acknowledge and agree that each of the parties will be irrevocably damaged in the event a Party were to violate or breach the provisions of this section 13 Agreement. Therefore, a party may ask the Arbitrator(s) to provide equitable relief, such as an injunction, against a party that violates its noncompete obligations set forth in this section 13.

14.    Confidential Information.    The parties acknowledge and agree that they have executed and delivered the Nondisclosure Agreement attached hereto as Attachment 4.    The provisions of Attachment 4 incorporated in this Agreement by reference and unless this Agreement specifically amends or modifies the provisions of the Confidentiality Agreement, it shall remain in full force and effect during the term of this Agreement under the terms of the Confidentiality Agreement, whichever is longer.

15.    Technical Support.    During the term of this Agreement, each of the parties shall provide technical support to the other party and to the customers of the other party as may be reasonably requested from time to time.

16.    <u>Compliance with Law</u>.    Each of the parties represents, certifies and covenants that it shall fully comply with applicable laws, rules regulations and ordinances (collectively, "Laws") in the performance of its obligations under this Agreement.    These shall include, but not be limited to applicable import/export laws, rules, regulations and requirements.    Each of the parties shall maintain and retain sufficient documentation in order to enable the country of origin of Products/Components to be traced.

17.    <u>Miscellaneous Provisions</u>.

(a)    <u>Entire Agreement</u>.    This Agreement and the Attachments constitute the entire agreement between the parties with respect to the subject matter hereof.    This Agreement and the entire attachment supersede any and all other agreements between the parties, whether written or oral relating to the subject matter hereof.

(b)    <u>Amendment</u>.    This Agreement may only be amended in a writing signed by each of the parties to this Agreement.

(c)    <u>Assignment.</u>    Neither party may assign any of its rights or obligations under this Agreement without the other party's prior written consent, which will not be unreasonably withheld or delayed.    No consent shall be required in connection with the assignment of this Agreement by a party to a wholly owned subsidiary corporation.    Any purported assignment and contravention of Agreement shall at the option of the non-assigning party be null and void and of no further force

and effect.   However, with respect to any permitted assignment, this Agreement shall narrow to the benefit of and be binding upon the respective successors and permitted assigns of the parties.    No assignment shall release either party from responsibility for the performance of any obligations of such party under this Agreement.

(d)    Waiver.   No term of provision of this Agreement shall be considered waived by either party and no breach consented to by either party unless such waiver or consent is in writing and signed on behalf of the Party against whom the waiver or consent is asserted.

(e)    Construction.    This Agreement is entered into by competent and sophisticated parties who are experienced in business matters.   Therefore, any ambiguous language in this Agreement should not be construed against any particular party as the drafter of this Agreement.

(f)    All notices and other communication shall be delivered in writing, but facsimile, pdf or courier to the addresses of the parties set forth on the signature page of this Agreement.

(g)    Further Assurances.   Each party agrees to do all acts and things and to may execute and deliver such written instruments as may be reasonably required to carry out the terms of provisions of this Agreement.

      (h)    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, and each counterpart shall be deemed an original of this Agreement.

      (i)    Survival.   Any and all provisions of this Agreement that by their terms are intended to survive termination of this Agreement, shall survive termination.

Executed this __4__ day of __November__, 2011.

Power Solutions International, Inc

By_____

    Gary Winemaster, President

Mast Powertrain, LLC

By_____

    Horace Mast, Managing Member