# EXHIBIT "3"

# THE SETTLEMENT AGREEMENT

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Agreement and Mutual Release (this "Agreement") is entered into effective as of the last date it is signed below ("Effective Date"). This Agreement is between Power Solutions International, Inc. ("PSI"), on the one hand, and Mast Powertrain, LLC, on the other hand ("Mast"). The above identified entities are sometimes referred to below as a "Party" or designated collectively as "Parties."

## RECITALS

A.     On or about April 28, 2011, PSI and Mast entered into an agreement regarding Mast supplying intake manifolds to PSI for 8.8L engines (the "2011 Supply Agreement").

B.     PSI and Mast entered into an agreement on or about November 4, 2011 (the "2011 Engine Development Agreement") regarding certain engine development and manufacturing services.

C.     On or about December 20, 2011, PSI and Mast amended the "2011 Engine Development Agreement" regarding the installation of certain equipment and Mast Manufacturing Services.

D.     On or about February 21, 2020, Mast demanded arbitration against PSI, alleging that PSI had breached the 2011 Engine Development Agreement.

E.     The Parties submitted the dispute to Judicial Arbitration and Mediation Services ("JAMS") by agreement, and on May 8, 2020, Mast filed its Statement of Claims, asserting causes of action against PSI for breach of contract and other claims. On June 1, 2020, PSI filed its answer denying Mast's claims and asserting a counterclaim against Mast for breach of contract. On June 15, 2020, Mast filed its response, denying PSI's counterclaim. The matter remains pending as JAMS Ref. No. 1345001469 (the "Arbitration").

F.     PSI denies Mast's allegations set forth in the Arbitration. Mast denies PSI's allegations set forth in the Arbitration. Nevertheless, the Parties to this Agreement wish to settle and compromise all existing and potential claims between them.

G.     Each of the Parties to this Agreement have assented freely and voluntarily to its terms.

## AGREEMENT

NOW, THEREFORE, in consideration of the provisions of this Agreement, which fully and completely satisfies the claims released herein, the Parties, and each of them, agree as follows:

1.     Recitals. The foregoing recitals are true and correct and by this reference are incorporated herein.

2.     Cash Settlement Payment. PSI shall pay to Mast a cash settlement payment in the amount of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS

Page 1 of 10 Pages

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

($1,500,000.00) (the "Cash Settlement Payment"), which shall be paid to Mast by wire transfer using the instructions attached hereto as Appendix I. The Cash Settlement Payment shall be paid in three installments of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) as follows:

     (i)    the first installment of the Cash Settlement Payment shall be paid no later than fifteen (15) days after the Effective Date;

     (ii)    the second installment of the Cash Settlement Payment shall be paid not later than seventy-five (75) days after the Effective Date; and

     (iii)    the third and last installment of the Cash Settlement Payment shall be paid not later than one hundred thirty-five (135) days after the Effective Date.

3.    Engineering Services and Supply Agreement. Contemporaneous with the execution of this Agreement, Mast and PSI shall enter into an Engineering Services and Supply Agreement. A copy of the agreed Engineering Services and Supply Agreement is attached to this Agreement as Appendix II, the provisions and terms of which are expressly incorporated herein.

4.    Amendment of the 2011 Supply Agreement. Contemporaneous with the execution of this Agreement, Mast and PSI shall enter into an amendment to the 2011 Supply Agreement, substantially in the form attached hereto as Appendix III, which shall, among other things, provide that the term of the 2011 Supply Agreement shall be extended to April 28, 2023 (the "2011 Supply Agreement Amendment").

5.    Dismissal of the Arbitration. Subject to the provisions of Section 23 of this Agreement, within five (5) business days of Mast's receipt of (i) the full amount of the Cash Settlement Payment, (ii) the Engineering Services and Supply Agreement executed by PSI, and (iii) the 2011 Supply Agreement Amendment executed by PSI, the Parties shall cause any and all claims and counterclaims pending in the Arbitration to be dismissed in their entirety with prejudice.

6.    Termination of the 2011 Engine Development Agreement.

(i)    Subject to the provisions of Section 23 of this Agreement, effective upon (a) the payment by PSI of the full amount of the Cash Settlement Payment, (b) execution of the Engineering Services and Supply Agreement, and (c) the execution of the 2011 Supply Agreement Amendment, the 2011 Engine Development Agreement shall automatically terminate including all amendments or modifications thereto, along with any remaining obligations of either Party under the 2011 Engine Development Agreement, including any obligations for payment of past or future royalties.

(ii)    Notwithstanding anything in the 2011 Engine Development Agreement to the contrary, following the termination of the 2011 Engine Development Agreement pursuant to this Agreement: (a) each Party (the "Receiving Party") shall archive all of the "Confidential Information," as defined in the 2011 Supply Agreement, of the other Party (the "Disclosing Party") in the Receiving Party's possession, custody, or control so that it remains accessible to the Disclosing Party for a period of five (5) years; (b) there shall be no limitations (1) on Mast's use

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

of the use of the "Intellectual Property" within the "Mast Markets" or (2) PSI's use of the "Intellectual Property" within the "PSI Markets," as those terms are defined in the 2011 Engine Development Agreement; and (c) each Party shall retain ownership of all test engines, engine parts, and research and development parts and materials related to the 2011 Engine Development Agreement that are presently in their respective possession (the "Remaining Materials"), and there shall be restrictions or limitations on either Party with respect to use of the Remaining Materials.

7.    <u>Full and General Release by each Mast Party as to PSI</u>. Subject to the provisions of Section 23 of this Agreement, in exchange for the consideration provided in this Agreement (including the covenants, releases, and promises of PSI), and effective upon the delivery by PSI of (i) the full amount of the Cash Settlement Payment, (ii) the Engineering Services and Supply Agreement executed by PSI, and (iii) the 2011 Supply Agreement Amendment Mast, on behalf of itself and its agents, representatives, successors, and assigns, hereby fully, forever, irrevocably, and unconditionally waives, releases, discharges, and covenants not to sue PSI, and any and all of PSI's agents, representatives, successors, and assigns, and all persons acting by, through, under, or in concert with them (collectively, the "PSI Released Parties"), from and/or for any and all claims which Mast may currently have or could have had against the PSI Released Parties, whether known or unknown, asserted or unasserted,  which arise out of, relate to, or concern the subject matter of the Arbitration in any way. Such release does not preclude claims that arise after the Effective Date of this Agreement, including future claims related to the 2011 Supply Agreement, the 2011 Supply Agreement Amendment, or the Engineering Services and Supply Agreement. For avoidance of doubt, this release does not include or otherwise impact Mast's and PSI's current supply arrangements and obligations pursuant to 2011 Supply Agreement, and the 2011 Supply Agreement remains in full force and effect.

8.    <u>Full and General Release by PSI as to Mast</u>. In exchange for the consideration provided in this Agreement (including the covenants, releases, and promises of Mast) PSI, on behalf of itself and its agents, representatives, successors, and assigns, hereby fully, forever, irrevocably, and unconditionally waives, releases, discharges, and covenants not to sue Mast, and any and all of Mast's owners, agents, representatives, successors, and assigns, and all persons acting by, through, under, or in concert with them (collectively, the "Mast Released Parties"), from and/or for any and all claims which PSI may currently have or could have had against the Mast Released Parties, whether known or unknown, asserted or unasserted, which arise out of, relate to, or concern the subject matter of the Arbitration in any way. Such release does not preclude claims that arise after the Effective Date of this Agreement, including future claims related to the 2011 Supply Agreement, the 2011 Supply Agreement Amendment, or the Engineering Services and Supply Agreement. For avoidance of doubt, this release does not include or otherwise impact Mast's and PSI's current supply arrangements and obligations pursuant to 2011 Supply Agreement, and the 2011 Supply Agreement remains in full force and effect.

9.    <u>No Admission of Liability</u>. Neither the execution of this Agreement nor the performance of any term hereunder by either Party shall constitute or be construed as an admission of liability by either Party to this Agreement. The Parties understand and agree that liability for the matters alleged in the Arbitration, as well as liability for the matters that could have been alleged in the Arbitration, is disputed by the Parties and that this Agreement is a compromise of disputed claims and shall not be construed as an admission of liability with respect to those matters.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

10.    <u>Entire Agreement</u>. This document embodies the entire terms and conditions of this Agreement, and each Party acknowledges that it has not relied upon any warranties, representations or promises, except as set forth expressly in this Agreement. Any prior correspondence, memoranda or agreements, whether oral or written, are superseded in total by this Agreement. All words, phrases, sentences and paragraphs, including the recitals hereto, are material to this Agreement.

11.    <u>No Duress; Full and Independent Knowledge</u>. Each Party acknowledges and represents to the other that: (i) it has received or had the opportunity to receive independent legal advice from counsel of its own selection regarding the provisions of this Agreement and its legal effect; (ii) it fully understands the facts and has been fully informed as to its legal rights and obligations under this Agreement; and (iii) the Settlement Agreement is being entered into and signed by each Party knowingly, freely, and voluntarily, after having received, or having had the opportunity to receive, such legal advice and with such knowledge.

12.    <u>Governing Law and Forum Selection</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled exclusively in a court of competent jurisdiction in Chicago, Illinois. The Parties understand and agree that a breach of this Agreement is likely to cause irreparable injury and damages that may be difficult to measure, and for which there may be no adequate remedy at law. Notwithstanding anything to the contrary in this Section, the Parties agree that a non-breaching Party may seek any other remedies available to it, including but not limited to specific performance of this Agreement, and declaratory and injunctive relief in any court of competent jurisdiction.

13.    <u>No Waiver</u>. Any failure to enforce any terms or conditions of this Agreement by any of the Parties shall not constitute a waiver of any right to assert any of the terms and conditions of this Agreement.

14.    <u>Authority of Signing Parties and Representatives</u>. Each of the signatories to this Agreement warrants that he or she is fully authorized to enter into the terms and conditions stated herein, to execute the Settlement Agreement and to legally bind the Party on whose behalf he or she is signing.

15.    <u>Binding Effect</u>. This Agreement shall be legally binding upon the Parties' respective assigns, successors, heirs, principals, officers, directors, employees, parent companies, subsidiary companies, and affiliate companies.

16.    <u>Severability</u>. In the event any of the terms, conditions or covenants contained in this Agreement are held to be illegal, unenforceable and/or invalid by any court of competent jurisdiction, then any such term, condition or covenant shall immediately become null and void, leaving the remainder of this Agreement in full force and effect. Any such invalidity shall not affect any other terms, conditions or covenants contained herein which shall remain in full force and effect.

17.    <u>Counterparts</u>. This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement. Each Party

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

shall deliver its original signature page via FedEx to the other Party's counsel. To confirm that the Agreement has been executed, pending the delivery of original signatures, the Parties shall also exchange concurrently scanned PDF counterparts of their respective signatures.

18.    Electronic Signatures Binding. Notwithstanding anything in this Agreement to the contrary, the execution of this Agreement and transmission by electronic mail, fax, or other electronic means to the other Parties and counsel for the other Parties shall be binding on the Party signing and transmitting same to the same extent as if a counterpart of this Agreement bearing such Party's original signature had been delivered.

19.    Ambiguity; Construction. This Agreement is the result of mutual negotiation, and any rule of construction to the effect that any ambiguities in this Agreement are to be resolved against the drafting Party, including but not limited to Illinois law or any other statutes, legal decisions or common law principles of similar effect, shall have no application in the interpretation of this Agreement. Whenever the context so requires in this Agreement, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a joint venture, a trust, an estate, or any other entity. Captions and paragraph headings used herein are for convenience only and are not a part of this Agreement. Such headings shall not be used in construing this Agreement.

20.    Confidentiality. The Parties agree to maintain the terms of this Agreement strictly confidential except as otherwise provided in this paragraph. The Parties agree that they will not disclose to any non-party, except the Parties' respective attorneys, auditors, employees, employers, insurers, lenders, and other representatives who need to know the terms of this Agreement in furtherance of their respective duties, any of the terms of this Agreement except as, and only to the extent that, such disclosure is required by applicable law or regulation, or in response to an enforceable subpoena or regulatory request or order issued by a court or other tribunal having jurisdiction to do so. Notwithstanding the foregoing, the Parties may disclose the terms of this Agreement in connection with the enforcement of this Agreement and otherwise may disclose to any third party only that "their dispute has been amicably resolved."

21.    No Assignment. Each Party represents and warrants to each other Party that such Party has not assigned or otherwise transferred, or purported to assign or otherwise transfer, in any manner, including by way of subrogation or operation of law or otherwise, any portion of any of the claims released by this Agreement.

22.    Attorneys' Fees. Except as otherwise stated in this Agreement, each Party to this Agreement agrees to bear its own costs, expenses, and attorneys' fees with respect to the Arbitration, the negotiation and drafting of this Agreement, and the negotiations and settlement which led to this Agreement. In the event of any legal action between the Parties arising from or relating to this Agreement, including any action to enforce any default or to enforce any terms of this Agreement, the prevailing Party in such dispute shall be entitled to recover from the non-prevailing Party reimbursement of its reasonable attorneys' fees and costs.

23.    Invalidation of Transaction. Notwithstanding anything in this Agreement to the contrary, in the event any payment of the Cash Settlement Payment to Mast pursuant to this

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

Agreement shall be set aside, invalidated, or voided as a preference or a fraudulent transfer, or if for any other reason Mast is required to return all or any portion of a payment received by Mast pursuant to this Agreement as a result of PSI's acts or omissions, all of PSI's obligations with respect to the 2011 Engine Development Agreement, as such obligations existed immediately prior to the execution of this Agreement, shall be reinstated and shall be deemed to be in full force and effect in favor of Mast.

EACH OF THE UNDERSIGNED HAS CAREFULLY READ AND UNDERSTANDS THE CONTENTS OF THIS AGREEMENT.

EACH OF THE UNDERSIGNED HAS REVIEWED THE TERMS OF THIS AGREEMENT WITH HIS/HER/ITS ATTORNEY. IN SIGNING THIS AGREEMENT, EACH OF THE UNDERSIGNED IS RELYING ON ITS/HIS/HER OWN INVESTIGATION, JUDGMENT, BELIEF AND KNOWLEDGE AND THE ADVICE OF HIS/HER/ITS COUNSEL AND IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS MADE BY ANY OTHER PARTY OR COUNSEL FOR ANY OTHER PARTY TO THIS AGREEMENT.

*[Signature page follows]*

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the Effective Date.

SIGNATURES:

**MAST POWERTRAIN LLC**

Dated: _____07 / 27 / 2021_____

_____

Authorized Signature

**POWER SOLUTIONS INTERNATIONAL, INC.**

Dated: _____07 / 27 / 2021_____

_____

Authorized Signature

Page 7 of 10 Pages

**Appendix II**

## American State Bank (ASB)

## Wire Instructions

**Wire Transfer Information**

**Instructions**

• Make sure that you make a reference to the sales order or invoice that you are submitting the transfer to.

• You are responsible for any fees involved with this transfer, make sure the bank understands that so they take the fee from you and not Mast Powertrain.

• MAKE SURE THE WIRE TRANSFER IS TO MAST POWERTRAIN, AND NOT TO AN INDIVIDUAL

Page 8 of 10 Pages

**Appendix II**

[Engineering Services and Supply Agreement]

Page 9 of 10 Pages

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

## ENGINEERING SERVICES AND SUPPLY AGREEMENT

This Engineering Services and Supply Agreement ("Agreement") is entered into this 27th day of July, 2021, by and between Mast Powertrain, LLC ("Mast") and Power Solutions International, Inc. ("PSI"). The above identified entities are sometimes referred to below as a "Party" or designated collectively as "Parties." The terms and conditions of this Agreement are supported by good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

## RECITALS

A.    On or about April 28, 2011, PSI and Mast entered into an agreement regarding Mast supplying intake manifolds to PSI for 8.8L engines (the "2011 Supply Agreement").

B.    On November 4, 2011, PSI and Mast entered into an agreement regarding certain engine development and manufacturing services (the "2011 Engine Development Agreement").

C.    On July 27th, 2021, PSI and Mast entered into that certain Settlement Agreement and Mutual Release that, among other things, resolves certain issues with respect to the 2011 Engine Development Agreement (the "Settlement Agreement").

D.    PSI desires to develop and produce at least two new engines, and variants of those engines (the "Program").

E.    At present, PSI generally anticipates that the engines to be developed under the Program will fall into the following categories (collectively, the "Engines"):

(i)    an engine for applications that will not require the engine to meet EPA HD Highway greenhouse gas $CO_2$ emission standards for spark-ignition engines installed in vocational vehicles with a requirement of 627 grams per brake horsepower-hour measured over the Heavy-duty FTP engine test cycle ("EPA HD Highway GHG") that is intended to be a suitable replacement for General Motor's 6.0 liter L96/LC8 V-8 engine, which PSI presently anticipates will also be a 6.0 liter engine (the "N6L Engine");

(ii)    an engine similar in size to the N6L Engine that is intended to comply with the EPA HD Highway GHG emissions standards (the "C6L Engine" and, together with the N6L Engine, the "6L Engines");

(iii)    a larger-displacement engine for applications that will not require the engine to meet EPA HD Highway GHG emissions standards, which PSI presently anticipates will be a 7.0 liter or larger engine (the "N7L Engine"); and

(iv)    an engine similar in size to the N7L Engine that is intended to comply with the EPA HD Highway GHG emissions standards (the "C7L Engine" and, together with the N7L Engine, the "7L Engines").

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

F.    The final displacement of the Engines has yet to be determined and is subject to the results of the development phase of the Program.

G.    PSI requires engineering and design services in connection with the development of the Engines under the Program (the "Engineering and Design Services").

H.    Mast has represented to PSI that Mast has knowledge, expertise and experience in such Engineering and Design Services and that he can provide such services in the design of the Engines without reliance on or infringing on the proprietary rights of others.

I.    PSI desires to retain Mast to provide such Engineering and Design Services related to the Program to PSI, and Mast desires to provide such services, on the terms and conditions set forth in this Agreement.

J.    PSI also requires the supply of certain engine components in connection with production of the Engines once developed.

K.    Mast has represented to PSI that Mast has knowledge, expertise and experience in manufacture and supply that will allow it to provide the Supplied Components (defined below).

L.    PSI desires to retain Mast to provide the Supplied Components to PSI, and Mast desires to provide the Supplied Components, on the terms and conditions set forth in this Agreement.

M.    Mast believes that its knowledge, expertise, and experience in manufacture and supply will allow it to supply PSI's requirements for the Engines developed under the Program and thereby reduce PSI's time and costs to bring the Engines to market.

N.    Accordingly, Mast desires an exclusive, except as to Weichai Power and its affiliates and subcontractors, six-month period to negotiate terms for the supply by Mast to PSI of complete, assembled, and warrantied Engines developed under the Program (the "Exclusive Negotiation Engine Supply Period").

O.    As consideration for, and a condition precedent to, the Settlement Agreement and the termination of the 2011 Engine Development Agreement, the Parties have agreed to enter into this Agreement.

## AGREEMENT

1.    <u>Recitals</u>. The recitals set forth above and the exhibits attached to this Agreement, including the capitalized terms used as defined terms therein, are hereby incorporated into this Agreement by reference.

2.    <u>Services Term</u>. Mast shall serve as a consultant to PSI, providing the services described in <u>Section 3</u> below, during the period commencing on the date of this Agreement and terminating on

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

the earliest of (a) completion of the services described in <u>Section 3</u> below, or (b) such time as this Agreement is terminated pursuant to <u>Section 11</u> (the "Services Term").

3.    <u>Services</u>.

(a)    <u>Exhibit A</u> hereto describes the scope of work (the "Scope of Work") and the engineering services to be performed by Mast and PSI (the Scope of Work and the engineering services are hereinafter jointly referred to as "Services") during the Services Term. Capitalized terms used in the Scope of Work as defined terms are incorporated herein by reference. Mast acknowledges the Scope of Work and agrees to provide to PSI the Services identified as Mast's responsibility during the Services Term pursuant to the terms of this Agreement. PSI acknowledges the Scope of Work and agrees to perform the Services identified as PSI's responsibility at its own cost during the Service Term pursuant to the terms of this Agreement. The Services shall be performed in several phases in accordance with the milestones set forth in <u>Exhibit B</u> (each a "Milestone" and collectively the "Milestones"). The Parties shall act in good faith to establish timelines for each of the Milestones within 28 days of the execution of this Agreement. The drawings, designs, specifications, data sheets, calculations, analyses, reports, native files, work product and all other information to be delivered under this Agreement shall be referred to hereinafter as the "Work Product."

(b)    Mast agrees to start the performance of the Services promptly following the date hereof and to perform the Services with all possible promptness and diligence. PSI reserves the right in accordance with <u>Section 11(b)(1)</u> to cancel this Agreement without liability to Mast, other than as provided in <u>Section 11</u>, and to reject the performance of any Service if such performance is not undertaken and completed within a reasonable time of the period specified, or within a reasonable time if not otherwise specified, or if such performance is not in accordance with specifications or the warranties provided by Mast pursuant to this Agreement; *provided, however,* that Mast shall be provided with reasonable time not to exceed (i) 90 days to fully cure any breach of this Agreement or deficiencies in performance of Services or (ii) 45 days with respect to Supplied Components to be delivered pursuant to <u>Section 4</u>.

(c)    With respect to each Milestone, the Services shall be considered complete when all Work Product required in connection with such Milestone has been tendered by Mast to PSI and determined by PSI's Representative (defined below), applying prevailing standards of commercial reasonableness, to be complete and in conformance with the specifications set forth in <u>Exhibit A</u>. For purposes of acceptance, the initial PSI Representative shall be identified in <u>Exhibit A</u> (the "PSI Representative"), and PSI may change the PSI Representative from time to time in its sole discretion upon written notice to Mast.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

(d)     Mast shall assign a competent representative to supervise and manage the performance of the Services, who shall be identified in <u>Exhibit A</u> (the "Mast Representative" and, together with the PSI Representative, each an "Assigned Representative" and, collectively, the "Assigned Representatives"). Any communication, confirmed in writing, from PSI to the Mast Representative of the existence of any design deficiencies, or of the use by Mast of any unsafe methods in any or all of its various activities in connection with the performance of the Services, or otherwise related to the performance of the Services, shall constitute valid notice to Mast pursuant to <u>Section 32</u> of this Agreement.

(e)     Mast agrees to provide PSI with written status reports at least once every two weeks or as otherwise agreed in writing, which shall be reasonably acceptable to PSI, and which shall update PSI on Mast's performance progress, Milestone achievements, budget status and issues, performance issues, staffing, and all other matters reasonably requested by PSI.

(f)     Upon completion of the Services, Mast agrees to provide consulting and oversight services to PSI at substantially similar rates, adjusted for inflation, and on terms and conditions as set forth in this Agreement and confirmed in writing by the parties within a reasonable period of time following the expiration of the Services Term.

4.     <u>Supply of Components</u>.

(a)     Provided that this Agreement has not been previously terminated, PSI agrees to purchase from Mast, subject to competitive pricing set out in Section 4(b) below, quality controls being met and the agreed terms and conditions of this Agreement, PSI's requirements of the following Components (the "Supplied Components"):

(i)   6L Engine Aluminum Cylinder Heads; and

(ii)  7L Engine Aluminum Cylinder Heads.

(b)     The price of the Supplied Components to PSI, whether provided "bare" (*i.e.*, unassembled) to PSI or assembled, shall not exceed, respectively, the bare and assembled prices quoted and terms set forth on <u>Exhibit C</u> (the "Quoted Cylinder Head Prices"). To the extent that, the unit cost for the Quoted Cylinder Head Prices, net of any cost reductions experienced by Mast, increases after the commencement of production of the applicable Engine (the "Production Start Date") and provided that Mast provides PSI with supporting documentation of such cost increase, Mast shall have the right to adjust the price for the Cylinder Heads for that Engine by an amount not more than the net amount of such increase. As a condition to any such price increase, Mast must send written notification to PSI at least 60 days prior to the proposed price increase, setting forth the amount of the price increase and including documentation demonstrating the increase in costs. Upon request, Mast agrees to provide any additional documentation relating to such cost increase

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

reasonably requested by PSI. The Parties acknowledge and agree that, with respect to the Supplied Components, PSI desires assurances that Mast's pricing and quality level will be competitive with the market and Mast desires assurances that it will not be required to compete against merely the lowest competitor-quoted price for the Supplied Components and that, accordingly, the purpose of this <u>Section 4(b)</u> is to (i) provide PSI with assurance that Mast will meet industry quality standards and not overcharge PSI for the Supplied Components and (ii) provide Mast with assurance that it will not be obligated to supply PSI's requirements for the Supplied Components at a loss. For avoidance of doubt, PSI's refusal to accept cylinder heads from Mast which are not in conformance with the criteria of this Section 4 shall not be considered to be a termination for convenience pursuant to <u>Section 11(b)(ii)</u>.

(c)    Mast and PSI agree to negotiate in good faith with respect to Mast's supply to PSI of the following additional engine components:

   (i)    PSI's requirements of plastic intake manifolds for the Engines;

   (ii)   PSI's requirements of non-plastic intake manifolds for the Engines and other PSI engines not already covered by the 2011 Supply Agreement;

   (iii)  PSI's requirements of the iron block for the 6L Engines; and

   (iv)   PSI's requirements of the iron block for the 7L Engines.

5.    <u>Exclusive Negotiation Engine Supply Period.</u>

(a)    Mast shall work in good faith to present terms to PSI that shall modify the Scope of Work whereby Mast or one or more of its affiliates will supply PSI's requirements for the Engines developed under the Program. Mast represents to PSI that, as the supplier of the Engines:

   (i)    Mast shall work in good faith to reduce PSI's time required for adoption of the Engines into the market;

   (ii)   Mast shall work in good faith to reduce PSI's cost of Engineering and Design Services related to the Program;

   (iii)  Mast shall work in good faith to reduce PSI's capital cost for component tooling, fixtures, and assembly equipment for the Engines; and

   (iv)   Mast shall work in good faith to reduce PSI's cost for engine calibration, emissions certification, validation, durability testing, and process testing.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

(b)     Mast and PSI agree to explore in good faith the commercial feasibility of Mast's
        supply to PSI of Engines. PSI shall exclusively, except for Weichai Power and its
        affiliates and subcontractors, negotiate with Mast for the supply of the Engines
        commencing on the date of this Agreement and for a period of six months
        thereafter. For avoidance of doubt, PSI shall have no obligation to modify the Scope
        of Work whereby Mast or one or more of its affiliates will supply PSI's
        requirements for Engines and PSI, in its sole discretion, may reject in whole or in
        part any terms presented by Mast for such supply.

6.   <u>Change Order</u>.

(a)     Either Party may, at any time, propose to the other Party changes to the Scope of
        Work by altering, adding to or deducting from the Scope of Work, by providing to
        the other Party's Party Representative a reasonably detailed written notice
        specifying the requested changes to the Scope of Work. The receiving Party shall
        in its sole discretion, but in any event within ten (10) business days of receipt of
        such request: (i) confirm the proposed changes, and the Parties shall then amend
        the Scope of Work accordingly prior to performance of the modified Scope of
        Work, or (ii) reject the proposed changes, in which event the Parties' Party
        Representatives shall promptly consult with each other in good faith to reach a
        mutually acceptable adjustment to the Scope of Work, if any. In the event that the
        Party Representatives cannot agree to a mutually acceptable adjustment to the
        Scope of Work within twenty (20) days of the receiving Party's receipt of such
        request, the Scope of Work shall remain unchanged. The Services under the
        changed Scope of Work shall be performed in accordance with the same standards
        and shall be warranted consistent with the prior Scope of Work. Mast shall not be
        paid for and hereby waives any claims for any changes to the Scope of Work or any
        services in addition to the Scope of Work that are not documented by written
        acknowledgment signed by both Parties.

(b)     In the event that a change to the Scope of Work is mandated by a change of law or
        engineering standards or relevant authorities, the party who learns of such change
        shall promptly notify the other party thereof and the parties shall consult with each
        other to reach a mutually acceptable solution.

7.   <u>Waiver of Liens or other Encumbrances</u>.

(a)     To the extent permitted by law, and provided that PSI has not breached any of its
        payment obligations under this Agreement and has timely paid Mast all amounts
        for which PSI is obligated for the supply of any labor or materials in the
        performance of the Services under this Agreement, Mast agrees, and shall cause
        each of its affiliates, suppliers, contractors, or subcontractors to agree, that no
        mechanic's, materialman's or other liens whatsoever shall be filed against PSI by
        Mast or any affiliates, suppliers, contractors, or subcontractors of Mast for the

Doc ID: a5ec5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

supply of any labor or materials in the performance of the Services under this Agreement.

(b)    Provided that PSI has not breached any of its payment obligations under this Agreement and has timely paid Mast all amounts for which PSI is obligated for the supply of any labor or materials in the performance of the Services under this Agreement, Mast shall indemnify, defend, and hold PSI and its affiliates, officers, directors, employees, representatives, and agents harmless from any and all expenses, claims, attorneys' fees, or other costs incurred by PSI in the event any liens, encumbrances, or charges are filed or asserted against PSI by Mast or any affiliates, suppliers, contractors, or subcontractors of Mast for the supply of any labor or materials in the performance of the Services under this Agreement.

(c)    PSI shall indemnify, defend, and hold Mast and its affiliates, officers, directors, employees, representatives, and agents harmless from any and all expenses, claims, attorneys' fees, or other costs incurred by Mast, including without limitation in the event any liens, encumbrances or charges are filed or asserted by any suppliers, contractors, or subcontractors against Mast or its affiliates, as a result of the failure of PSI to timely pay Mast all amounts for which PSI is obligated for the supply of any labor or materials in the performance of the Services under this Agreement.

8.    <u>Claims for Labor and Material</u>. Mast agrees it will promptly pay when due all just claims for labor and material purchased or procured by it or under its authority, for the provision of the Services; and in the event of a failure by Mast at any time to do so, Mast agrees that PSI may retain out of any money due or to become due to Mast an amount sufficient to satisfy all such claims, *provided*, however, that PSI agrees not to make any payment of said money so retained, if Mast notifies PSI in writing that it contests the validity of the claim in respect of which such amount is so retained, unless and until the validity of the claim is finally agreed upon or adjudicated.

9.    <u>Compensation for the Services</u>.

(a)    In consideration of Mast's performance of the Services under this Agreement, Mast shall, be entitled to compensation in accordance with the terms set forth in this Section; *provided* that PSI shall not be obliged to compensate Mast for any Services that are defective or non-conforming such that they would constitute a material breach of Mast's obligations under this Agreement, or any remedial efforts with respect thereto. For the avoidance of doubt, Mast shall not be entitled to any present or future royalties under this Agreement, including any royalty relating to the Services, Work Product, or Engines using the Supplied Components.

(b)    PSI has generated an internal budget estimate for the engineering services required to design and develop the Engines under the Program ("Engineering Services") of $1,100,000.00 (the "Budget"). The Parties recognize that success of the Program and the ability to develop the Engines in accordance with this Budget is not guaranteed and that if this Agreement is terminated pursuant Section 11 below,

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

Mast shall not be entitled to any compensation for Services not actually completed in conformance with this Agreement and Budget. The Parties agree to work in good faith, using the change order process stated in Section 6, to adjust this Budget for the Engineering Services to the extent that future circumstances demonstrate that the Parties' estimate of the necessary hours of engineering services proves inadequate (the Budget and any such subsequent budget, the "Engineering Services Budget").

(c)     Mast shall be entitled to compensation for performance of Engineering Services at a rate of $80.00 per hour, which shall be paid out of and subject to the Engineering Services Budget.

(d)     Mast shall be entitled to engage third parties in providing Engineering Services with PSI's prior written approval, which third-party Engineering Services shall also be paid out of and subject to the Engineering Services Budget. PSI shall only be obliged to pay Mast's direct pass-through costs for such third-party Engineering Services without any mark-up by Mast.

(e)     Mast shall be entitled to compensation at a rate of $120.00 per hour for management and supervision of the Services, including Engineering Services, whether such Services are provided by Mast employees or third parties (the "Management Services"), which shall be paid out of and subject to the Engineering Services Budget. In no event shall the total cumulative amount charged by Mast for Management Services exceed fifteen hundred hours.

(f)     PSI shall reimburse Mast for all reasonable, pre-approved costs and expenses incurred by Mast to purchase or manufacture, as applicable, the components necessary to produce a completed, fully-operational prototype of each of the four Engines, which costs and expenses shall not be paid out of or subject to the Engineering Services Budget.

(g)     PSI shall reimburse Mast for all reasonable, pre-approved travel expenses incurred in Mast's performance of Services under this Agreement. Any such expense approval shall be provided in writing, which expenses shall not be paid out of or subject to the Engineering Services Budget.

(h)     Mast shall submit a documented and itemized invoice each month to PSI covering the total amount of approved reimbursable costs and Services performed during the preceding month. Within 15 days after the receipt by PSI of Mast's correct invoice, PSI shall pay Mast the undisputed amounts set forth on the invoice. Mast shall e-mail the invoice to the following e-mail addresses or to such other e-mail addresses as may be formally advised in writing to Mast:

Address:     accountspayable@psiengines.com;
dino.xykis@psiengines.com; and
mark.damico@psiengines.com.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

In the event PSI disputes one or more items in an invoice, PSI shall promptly notify Mast in writing of the item or items under dispute and the reasons therefor. PSI shall have the right to withhold payment of any disputed items, and payment as to the remainder will be made as provided herein; *provided, however*, that payment of any amount, including any disputed amount, by PSI will not waive PSI's right subsequently to contest the correctness of the amount and seek reimbursement from Mast. PSI's final payment for any invoice shall in no way relieve Mast of any obligations or responsibilities under this Agreement which extend beyond the date of such final payment. For the avoidance of doubt, in addition to all rights to indemnification granted to PSI under Section 22(a) herein, Mast agrees to reimburse PSI for all amounts paid for Services if PSI cannot, or it becomes infeasible to, market or produce the Engines due to the entry of a final and non-appealable judgment by a court of competent jurisdiction finding that Mast has committed piracy, plagiarism, or infringement of any copyright, patent, or other intellectual property right of any kind whatsoever (an "Infringement Judgment"); *provided, however*, that such Infringement Judgment is not based on information provided by PSI to Mast for use in the Program; and *provided, further*, that Mast shall have a reasonable opportunity instead to cure, without cost to PSI, those conditions that would cause the marketing or production of the Engines to violate the Infringement Judgment.

(i)     Except as provided above, PSI shall not be responsible for any other costs and expenses incurred by Mast in connection with the performance of the Services, unless PSI has pre-approved such costs and expenses in writing. Mast agrees that to the extent that PSI has agreed in writing to pay any third-party costs and expenses, PSI shall be obliged to pay only Mast's direct pass-through costs without any mark-up by Mast.

10.     <u>Representations and Warranties</u>.

(a)     Mast represents and warrants to PSI that (i) it has the experience and expertise to perform the Services to be provided under this Agreement, (ii) it has the resources to complete the Services in a timely manner, (iii) it has the permit(s), license(s) and authority to perform the Services in the jurisdiction where they will be performed or can duly obtain them through subcontractors or affiliates, (iii) it shall perform the Services diligently, competently, in a good workmanlike manner, in accordance with the terms of this Agreement and in accordance with or exceeding the latest recognized governmental, professional engineering, and industry standards for such Services, (iv) all Services shall be performed in accordance with good and sound design and engineering practices and, to the extent not otherwise specified herein, in accordance with applicable recognized codes and practices, and (v) subject to Mast's reliance on the representation and warranty of PSI set forth in <u>Section 10(b)</u>, the completion of the Services and the deliverables in the Program shall not infringe on or misappropriate any intellectual property right of any third party.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

(b)    PSI represents and warrants that the information it provides Mast for use in the Program shall not infringe on or misappropriate any intellectual property right of any third party.

11.   <u>Termination</u>.

(a)    The Parties agree to act in good faith to develop the Engines under the Program and pursue their successful adoption in the market, including meeting the EPA HD Highway GHG emissions standards. The Parties also recognize that success of the Program is not guaranteed. The Parties thus agree not to voluntarily terminate this Agreement subject to the provisions below without consultation and good-faith negotiations among the Parties to resolve any deficiencies prior to any proposed termination and to explore alternatives to termination, including but not limited to jointly pursuing other development opportunities in the market. If, after such good-faith efforts, PSI concludes in its commercially reasonable judgment that the Program is technically or commercially infeasible, the Parties will agree to termination of this Agreement, upon 30 days written notice to Mast, on the condition that PSI shall not move forward with the Program and the supply of Components from another source, or else shall pay the Buy Out Amount pursuant to <u>Section 12</u>. For avoidance of doubt, if PSI terminates this Agreement on the grounds that it is infeasible commercially or technically but moves forward with the Program and/or supply of Components from another source it will be treated as a termination for convenience under section 11(b)(ii) herein.

(b)    PSI may also terminate this Agreement or Mast's supply of components by written notice to Mast

(i)    upon Mast's continued uncured material breach of the terms of this Agreement following ninety (90) days' written notice of such breach from PSI to Mast, or

(ii)    upon thirty (30) days' written notice to Mast in the event PSI elects to terminate this Agreement or Mast's supply of Components for convenience.

In the event of termination pursuant to subsection (ii), PSI shall, following receipt of all Work Product created prior to the termination effective date, reimburse Mast for all reasonable and documented costs and expenses actually incurred and uncontested Services performed prior to the effective date of termination pursuant to the terms of <u>Section 9</u> and pay to Mast the applicable Buy Out Amount (as defined below) pursuant to <u>Section 12</u>.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

 (c) Mast may terminate this Agreement by written notice to PSI upon PSI's continued uncured material breach of the terms of this Agreement following ninety (90) days' written notice of such breach from Mast to PSI.

 (d) If after termination of this Agreement pursuant to Section 11((b)(i) or 11(b)(ii), PSI requests that Mast assist PSI in connection with the transition of the Services to a third party, Mast shall do so in good faith and in a timely manner, and PSI shall promptly reimburse Mast for all pre-approved, reasonable costs and expenses actually incurred by Mast during and directly related to such transition.

 (e) Termination of this Agreement or completion of the Services or any parts thereof shall not release the parties from obligations which expressly or by their nature survive or extend beyond the Term of the Agreement, termination thereof, or completion of the Services.

12. Buy Out Amount. PSI acknowledges and agrees that by entering into this Agreement, Mast is giving up certain rights and foregoing certain opportunities in order to assist PSI with the Program. PSI further acknowledges and agrees that if the supply of Components is terminated Mast will have incurred costs, losses, and/or damages the amount of which will be incapable of precise determination. Recognizing the uncertainties associated with the Program, the Parties acknowledge and agree that if this Agreement is terminated due to the technical or commercial infeasibility of the Program pursuant to Section 11(a), each Party shall bear its own costs, losses, and/or damages. If PSI terminates this Agreement for convenience pursuant to Section 11(b)(ii), or if Mast terminates this Agreement pursuant to Section 11(c), however, PSI shall pay Mast NINE HUNDRED THOUSAND AND NO/100 DOLLARS ($900,000.00) as a buy-out, and not as a penalty (the "Buy Out Amount"). The Parties acknowledge and agree that the sum payable as the Buy Out Amount pursuant to the foregoing schedule bears a reasonable proportion, and is not plainly or grossly disproportionate, to the probable loss likely to be incurred by Mast and does not constitute a penalty. One of the reasons for the Parties to reach an agreement as to the payment of the Buy Out Amount is uncertainty and cost of determining Mast's actual damages. Further, Mast and PSI acknowledge and agree that they are sophisticated business parties, have been represented by sophisticated and able legal counsel, and negotiated the terms of this Agreement, including the terms of this Section 12, at arm's length.

13. Mast's Employees and Subcontractors.

 (a) Mast shall, and shall cause each of its employees, suppliers, contractors, subcontractors, agents and representatives to, retain only individuals with suitable professional training to perform the Services for PSI under this Agreement.

 (b) Mast and each of its employees, suppliers, contractors, subcontractors, agents, and representatives shall at all times have all permits, licenses and certifications required for the performance of the Services. Notwithstanding the foregoing, the Parties are not aware of any permits, licenses, and/or certifications required for the performance of the Services.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

(c)     Mast shall, and shall cause each of its employees, agents, representatives, suppliers, contractors and subcontractors to, comply at all times with all applicable labor laws, and Mast shall be responsible for all costs and expenses associated with labor costs and expenses (including travel, lodging, per diems and, taxes) of its employees, agents, representatives, suppliers, contractors, and subcontractors; *provided* that Mast may request reimbursement of such costs as expressly provided in this Agreement. Mast shall cause its employees and personnel and the employees of any suppliers, contractors, and subcontractors to comply at all times with reasonable human resources policies, including policies prohibiting (i) the use, at any time, of illegal drugs and (ii) the consumption of alcohol while on PSI premises or during the performance of the Services.

(d)     Mast shall not retain any agents, suppliers, contractors, consultants, engineers, or subcontractors to perform Services under this Agreement absent the subcontractor's ability to demonstrate, in writing and to PSI's reasonable satisfaction, its compliance with the confidentiality requirements set forth in <u>Section 17</u> below. No subcontracting of any of Mast's obligations under this Agreement shall relieve Mast of its obligations, responsibilities and liabilities for any Services performed or Work Product delivered by any of its subcontractors.

14.     <u>Independent Contractor</u>.

(a)     The relationship of Mast to PSI shall be that of an independent contractor. Nothing in this Agreement shall be construed as (i) entitling Mast or its employees, suppliers, contractors, engineers, subcontractors, or agents to control in any manner the conduct of the business of PSI or any of its affiliates, or (ii) giving Mast or its employees, subcontractors, or agents any right or authority to hold themselves out as an employee or officer of PSI or any of its affiliates or to bind PSI or any of its affiliates in any way.

(b)     In performing the Services, Mast shall at all times operate as an independent contractor, maintaining its own identity as distinct and separate from that of PSI and its affiliates. Nothing in this Agreement shall be deemed to create or constitute the relation of employer and employee between PSI or any of its affiliates on the one hand and Mast or any of its suppliers, contractors, consultants, engineers, subcontractors, or agents on the other hand. Mast and PSI hereby acknowledge that (i) Mast shall be solely responsible for and shall pay all taxes Mast incurs in respect of Mast's compensation and engagement hereunder, (ii) PSI will not withhold taxes or other amounts from any payments to Mast hereunder, and (iii) Mast shall be solely responsible for any employment, retirement, and disability protection and all other so-called "fringe benefits," of Mast's employees and PSI shall not in any way be responsible therefor.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

(c)     Mast is an independent contractor and has full power and authority to select the means, methods, and manner for performing the Services. Mast shall have complete control over the details of the Services and the manner in which the Services are to be accomplished. Mast shall be solely responsible for all work means, methods, techniques, sequences, and procedures for coordinating all parts of the Services.

15.    Proprietary Rights.

(a)     Mast acknowledges that PSI has exclusive rights to, and Mast hereby irrevocably and unconditionally assigns, and agrees to cause each of its employees, contractors, suppliers, and subcontractors performing the Services to assign, to PSI, any and all right, title and interest, including all intellectual property rights, in the design of (i) the 6L Engine Aluminum Cylinder Heads, (ii) the 7L Engine Aluminum Cylinder Heads, and (iii) any other Components that are not generally publicly available and have been designed uniquely for the Engines pursuant to the Program to allow the Engines to meet the EPA HD Highway GHG emissions standards.

(b)     Mast shall provide to PSI a complete set of all Work Product, including, without limitation, "as built," CAD, engineering, and design drawings such that PSI can review such drawings and can independently perform future repairs and modifications; *provided* that the materials provided shall be delivered to PSI in an organized fashion, in electronic format that shall permit data searches. Mast agrees, upon the reasonable request of PSI, and without further cost to PSI, to do all other acts, provide any evidence, and execute all documents reasonably necessary or desirable for the transfer, assignment, recordation, application, registration, issuance, maintenance, renewal, establishment and enforcement of any intellectual property rights assigned to PSI pursuant to this Section.

(c)     Documentation, including, but not limited to, drawings, specifications, plans, presentations, and any other materials, prepared exclusively for PSI by Mast and any other party engaged by Mast in the course of designing (i) the 6L Engine Aluminum Cylinder Heads and (ii) the 7L Engine Aluminum Cylinder Heads are "Instruments of Service." The Instruments of Service include, but are not limited to, materials in a physical format as well as a non-physical format, including, but not limited to, electronic and/or digital format. Mast and any party retained by Mast are deemed to be the author(s) of the Instruments of Service. Mast represents and warrants that every party employed by Mast, individual and organizational, have executed and will execute employment, engagement or other agreements as needed to completely and unconditionally assign and otherwise transfer all right, title, and interest in the Instruments of Service to Mast, including any works for hire under the Copyright statute 17 U.S.C. § 101 and any applicable local laws, as needed to perfect copyright therein. Mast agrees to assign and will execute documents at the request of PSI as needed for the complete and unconditional transfer to PSI of all rights including copyright in the Instruments of Service. Mast agrees to execute at

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

the request of PSI any document necessary to complete the assignment and transfer of all rights in the Instruments of Service to PSI.

(d)    Notwithstanding anything herein to the contrary, PSI agrees and acknowledges that the intellectual property rights set forth below are the exclusive property of Mast and shall not be transferred or assigned to PSI under this Agreement:

    (i)    Mast's intellectual property related to the design of tooling for (A) the 6L Engine Aluminum Cylinder Heads and (B) the 7L Engine Aluminum Cylinder Heads, which products will be supplied by Mast to PSI as Supplied Components under this Agreement.

(e)    Mast agrees to retain copies of all Work Product, material, content, ideas, know-how, creations, inventions or new products, relating to the Services, or PSI's facilities, products or business, which are created, designed or developed by Mast and its employees under this Agreement for a period of five (5) years following the expiry or termination of this Agreement.

16.    Other Rights.

(a)    Mast will have the right to purchase iron blocks, Engines, and other PSI-sourced components for the Program.

(b)    Mast and PSI agree to negotiate in good faith Mast's right to purchase other PSI engines and PSI engine components.

17.    Non-Disclosure of Confidential Information.

(a)    Each Party hereby agrees to keep secret and confidential from any third party for the period during which this Agreement is in effect, and for five (5) years following the expiry or termination of this Agreement, any and all information relating to the other Party's know-how, technology, intellectual property, inventions, trade secrets, designs, business plans, products, product content or formulation, markets, and processes which are disclosed by one Party (the "Disclosing Party") to the other Party (the "Receiving Party") in written, oral, or other tangible form (hereinafter referred to as "Confidential Information"). However, the Receiving Party shall have no such confidentiality obligation with respect to any of this Confidential Information which:

    (i)    is known to the Receiving Party at the time of disclosure by the Disclosing Party, as evidenced by written records in the possession of the Receiving Party;

    (ii)    is at the time of disclosure or thereafter becomes generally publicly available without the fault of Receiving Party; or

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

    (iii)  is subsequently disclosed to the Receiving Party by any third party on a non-confidential basis and not under a secrecy obligation to the Disclosing Party.

(b)    Each Receiving Party hereby agrees to use Confidential Information it receives solely in connection with the Program and solely for the benefit of the Parties.

(c)    Each Receiving Party agrees to inform each of its employees, suppliers, agents, representatives, consultants, engineers, contractors, and subcontractors who participate in the performance of the Services of the provisions of this Section, and, at the request of the Disclosing Party, shall cause each such employees, suppliers, agents, representatives, and subcontractors to sign a confidentiality agreement substantially similar in form and substance to the provisions of this Section. The Receiving Party shall be responsible to Disclosing Party for any disclosure of Confidential Information by any of its employees, suppliers, agents, representatives, and subcontractors in violation of their respective confidentiality obligations.

(d)    Each Party agrees that it may not use the other Party's name or disclose its relationship to such other Party under this Agreement in any advertising or marketing materials without such other Party's prior written consent, which may be withheld, conditioned, or delayed in such other Party's sole reasonable discretion.

(e)    The Parties acknowledge and agree that this Section supersedes and replaces any prior agreement or understanding among the parties with respect to the Confidential Information.

18.    Return of Confidential Information. Upon expiry or termination of this Agreement, a Disclosing Party may request that a Receiving Party (i) return or (ii) archive all of the Confidential Information in the Receiving Party's possession, custody, or control and that of its employees, suppliers, agents, representatives, and subcontractors. The Receiving Party may elect to delete or destroy all Confidential Information it is requested to return where it would be impossible or commercially infeasible to return such Confidential Information; *provided, however,* that such Receiving Party will reasonably cooperate with the Disclosing Party to return (i) Confidential Information of which the embodiment in the Receiving Party's possession, custody, or control is the sole embodiment or example and (ii) Confidential Information for which the Disclosing Party agrees to pay the Receiving Party's documented out-of-pocket costs to return. If the Disclosing Party requests that the Receiving Party archive some or all of the Confidential Information, the Disclosing Party shall pay the Receiving Party's documented out-of-pocket costs for such archiving. The archiving of the Disclosing Party's Confidential Information shall be in accordance with the Receiving Party's archiving of its own Confidential Information but at a standard at least as restrictive as the standard for Confidential Information set forth in this Agreement. Upon the return of all Confidential Information to the Disclosing Party or the completion of the archiving of

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

all Confidential Information, each Receiving Party shall provide to each Disclosing Party a certificate affirming the Receiving Party's compliance with this <u>Section</u>.

19.    <u>Non-Solicitation</u>.

    (a)    During the Term of this Agreement and for a period of 12 months thereafter, neither Party shall, directly or indirectly, solicit, interfere with, or endeavor to entice away or divert from the other Party or any of its affiliates (i) any business of the other Party or its affiliates or (ii) any person who was employed by the other Party or any of its affiliates at any time during the Term of this Agreement.

    (b)    Each Party agrees that (i) these restrictions will not cause it undue hardship and are reasonable and necessary to protect the other Party and its affiliates' legitimate interests (ii) there are numerous other business opportunities available to such Party not affected by these restrictions, and (iii) any violation of these restrictions would result in immediate and irreparable injury to the other Party or its affiliates for which the other Party or its affiliates would have no adequate remedy at law.

20.    <u>Indemnity</u>.

    (a)    Mast agrees to defend, indemnify and hold harmless PSI and its affiliates, and their respective shareholders, officers, directors, employees, agents and representatives, past, present and future, and any of them, from and against any and all obligations, claims, demands, damages, actions, rights of action, costs and expenses (including, but not limited to, attorneys' fees and disbursements) of every kind and nature whatsoever, including, but not limited to, those on account of property damage, bodily injury or death, arising out of or because of: (i) Mast's negligence or misconduct in the performance of this Agreement; (ii) any breach of any of Mast's representations, warranties, or covenants under this Agreement; (iii) Mast's unlawful disclosure, use or misappropriation of another party's trade secret or Confidential Information; (iv) Mast's piracy, plagiarism or unfair competition; or (v) Mast's infringement of any copyright, patent or other intellectual property right of any kind whatsoever arising out of services provided or Services performed by Mast (excluding infringement by PSI's products, trademarks, trade names, service marks, etc., of others' patents, names or marks).

    (b)    PSI agrees to defend, indemnify and hold harmless Mast and its affiliates, and their respective shareholders, officers, directors, employees, agents and representatives, and any of them, from and against any and all obligations, claims, demands, damages, actions, rights of action, costs and expenses (including, but not limited to, attorneys' fees and disbursements) of every kind and nature whatsoever, including, but not limited to, those on account of property damage, bodily injury or death, arising out of or because of: (i) PSI's negligence or misconduct in the performance of this Agreement; (ii) any breach of any of PSI's representations,

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

warranties, or covenants under this Agreement; (iii) PSI's unlawful disclosure, use or misappropriation of another party's trade secret or Confidential Information; or (iv) PSI's piracy, plagiarism, or unfair competition; or (v) PSI's infringement of any copyright, patent or other intellectual property right of any kind whatsoever arising out of information or services provided by PSI in connection with the Program (excluding infringement by Mast's products, trademarks, trade names, service marks, etc., of others' patents, names or marks)

21.    Liability Limitation. **EXCEPT FOR LIABILITIES AND OBLIGATIONS ARISING UNDER SECTIONS 6, 7, 8, 9, 10, 11, 12, 13, 14, AND 15. NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, ECONOMIC, INCIDENTAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES.**

22.    Environmental Requirements and Hazardous Materials. Mast shall take commercially reasonable steps to ensure that all Services, and all Work Product and Supplied Components delivered to PSI hereunder shall be, in compliance with all environmental, legal, regulatory, and/or industry requirements and standards relating to the environment or hazardous materials in the country of performance. Mast shall notify PSI of any developments or anticipated changes in the environmental, legal, regulatory, and/or industry requirements and standards of which Mast is aware relating to the environment or hazardous materials applicable to the Program, the Services, or the Supplied Components that may impact the viability of the Program.

23.    Safety. Mast shall take commercially reasonable steps to ensure that the Work Product and Supplied Components comply with all legal requirements, including, without limitation, all applicable fire, safety, engineering, or other applicable codes promulgated by any federal, state or local authority, agency, or association of the jurisdictions in which the Services are performed. Notwithstanding Mast's adherence to any safety rules, regulations and policies that PSI may have, Mast acknowledges and agrees that PSI's safety rules, regulations, and policies, if any, do not in any way relieve Mast of its obligations with respect to safety rules, regulations, and guidelines applicable to the Scope of Work, the Work Product, and the Services.

24.    Governing Law. This Agreement and all disputes between the parties shall be governed by the laws of the State of Illinois, exclusive of its conflict-of-laws provisions.

25.    Arbitration. This Agreement and all disputes, claims, demands, liabilities and causes of action related to this Agreement shall be exclusively resolved by arbitration, by a sole and independent arbitrator, before Judicial Arbitration and Mediation Services, and shall proceed in accordance with the JAMS Comprehensive Arbitration Rules and Procedures. The selection of the independent arbitrator shall be made by agreement of the parties. If the Parties cannot agree upon the selection of an independent arbitrator, the arbitrator shall be appointed pursuant to the JAMS Comprehensive Rules. The arbitrator shall determine the rights and obligations of the Parties according to the applicable substantive laws and the express terms of this Agreement. The exclusive venue for any disputes under this Agreement or otherwise shall be Chicago, Illinois, USA. The arbitrator shall not be empowered to grant any damages in excess of those damages permitted or limited under the express terms of this Agreement. The Party prevailing on

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

substantially all of its claims in arbitration shall be entitled to request from the arbitrator to permit recovery of its costs, including attorneys' fees on a full indemnity basis, for the arbitration proceeding, as well as any ancillary proceedings, including a proceeding to compel enforcement of an award, or enjoin arbitration, to request interim measures, or to confirm or set aside an award.

26.    Entire Agreement. This Agreement, including any exhibits attached hereto, is intended to be the exclusive and final statement of the terms and understandings relative to the subject matter hereof, merging herein and superseding all negotiations and prior written or oral agreements between the parties as to the subject matter of this Agreement. There are no promises, representations or understandings made in connection with this Agreement or contemporaneous with the execution hereof, except as set forth in this Agreement. All words, phrases, sentences and paragraphs, including the recitals hereto, are material to this Agreement.

27.    Mutually Drafted Agreement. Each Party has had the opportunity to have this Agreement reviewed by legal counsel and it is the product of arms-length negotiations and therefore it shall be interpreted as mutually drafted by the Parties.

28.    Amendment and Assignment. No modification or amendment of this Agreement shall be valid unless it is in writing and signed by both of the Parties hereto. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties hereto and their successors and permitted assigns. This Agreement may not be assigned by Mast without the prior written consent of PSI. This Agreement may not be assigned by PSI without the prior written consent of Mast.

29.    Authority of Signing Parties and Representatives. Each of the signatories to this Agreement warrants that he or she is fully authorized to enter into the terms and conditions stated herein, to execute the Agreement and to legally bind the Party on whose behalf he or she is signing.

30.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

31.    Electronic Signatures Binding. Notwithstanding anything in this Agreement to the contrary, the execution of this Agreement and transmission by electronic mail, fax, or other electronic means to the other Parties and counsel for the other Parties shall be binding on the Party signing and transmitting same to the same extent as if a counterpart of this Agreement bearing such Party's original signature had been delivered.

32.    Notices. Except as provided in Section 3(d) above, any notice or other communication required under this Agreement shall be in writing and either delivered personally to the addressee or faxed (with confirmation received) to the addressee, sent by express courier to the addressee or mailed, certified or registered mail, postage prepaid, and shall be deemed given when so delivered personally, faxed to the addressee (and confirmation received), or, if sent by express courier, two business days after the date so sent, or, if mailed, seven business days after the date of mailing, to the applicable address as follows:

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

If to PSI:

Power Solutions International, Inc.
201 Mittel Dr.
Wood Dale, IL

Attn: William Buzogany, Esq.

If to Mast:

Mast Powertrain, LLC
330 NW Stallings Dr.
Nacogdoches, Texas 75964

Attn: Horace Mast

*With a copy to:*

Travis P. Clardy
Holland & Knight LLP
111 Congress Avenue, Suite 540
Austin, Texas 78701

Either Party hereto may change its address for notices hereunder by providing notice of such address change to the other party in accordance with this Section 32.

33.    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction, and PSI and Mast shall negotiate an equitable adjustment in the provisions of this Agreement with a view toward effecting the purpose of this Agreement.

EACH OF THE UNDERSIGNED HAS CAREFULLY READ AND UNDERSTANDS THE CONTENTS OF THIS AGREEMENT.

EACH OF THE UNDERSIGNED HAS REVIEWED THE TERMS OF THIS AGREEMENT WITH HIS/HER/ITS ATTORNEY. IN SIGNING THIS AGREEMENT, EACH OF THE UNDERSIGNED IS RELYING ON ITS/HIS/HER OWN INVESTIGATION, JUDGMENT, BELIEF, AND KNOWLEDGE AND THE ADVICE OF HIS/HER/ITS COUNSEL AND IS NOT RELYING ON ANY REPRESENTATIONS OR STATEMENTS MADE BY ANY OTHER PARTY OR COUNSEL FOR ANY OTHER PARTY TO THIS AGREEMENT.

*[Signature page follows]*

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

SIGNATURES:

**MAST POWERTRAIN LLC**

Dated: _____07 / 27 / 2021_____

_____
Authorized Signature


**POWER SOLUTIONS INTERNATIONAL, INC.**

Dated: _____07 / 27 / 2021_____

_____
Authorized Signature

Page 20 of 25 Pages

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

### Exhibit A

### Services – Scope of Work

(a)    Mast shall commit sufficient resources to meet the agreed to Milestones and will be responsible for performing one-hundred percent of the computer aided design ("CAD"), engineering, and design drawings using PSI's templates for the components of the Engines. Mast will be responsible for designing the Engines, including, but not limited to, the design of the following Engine components (each a "Component" and, together, "Components"):

    1.  cylinder heads, and tooling for same;

    2.  intake manifold; and

    3.  engine block.

(b)    For PSI's sourced parts, PSI will be responsible for all Work Product from PSI's supply chain, suppliers, vendors, consultants, and internally allocated costs associated with the procurement of Components.

(c)    Mast will be responsible for delivery to PSI of a completed, fully-operational prototype of each of the four Engines:

    1.  a N6L Engine, made with new prototype aluminum cylinder heads that need not comply with the EPA HD Highway GHG standards (the "6L Non-GHG Compliance Aluminum Cylinder Heads");

    2.  a C6L Engine, made with new prototype cylinder heads intended to comply with the EPA HD Highway GHG emissions standards (the "6L GHG Compliance Aluminum Cylinder Heads" and, together with the 6L Non-GHG Compliance Aluminum Cylinder Heads, the "6L Engine Aluminum Cylinder Heads");

    3.  a N7L Engine, made with new prototype aluminum cylinder heads that need not comply with the EPA HD Highway GHG emissions standards (the "7L Non-GHG Compliance Aluminum Cylinder Heads"); and

    4.  a C7L Engine, made with new prototype cylinder heads intended to comply with the EPA HD Highway GHG greenhouse gas emissions standards (the "7L GHG Compliance Aluminum Cylinder Heads", together with the 7L Non-GHG Compliance Aluminum Cylinder Heads, "the 7L Engine Aluminum Cylinder Heads" ).

(d)    PSI will be responsible for all engineering and tasks required to transition Mast's Work Product, including the prototype Engines, into production Engines and their successful adaptation into the market.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

(e)     Mast will be responsible for communicating regularly with PSI to ensure that the design of each Engine meets the technical specifications and requirements of PSI.

(f)     Mast will be responsible for delivering a complete design for each Engine and each Component, including complete CAD drawings and complete native files for each Engine and Component.

(g)     PSI will have the right to approve each Engine prototype delivered by Mast to PSI based on the following criteria:

    1.  Mast will be responsible for dynamometric testing of each Engine to ensure proper assembly; and

    2.  PSI will be responsible for dynamometric testing to evaluate the Engines' compliance with EPA HD Highway GHG emissions.

(h)     Mast will be responsible for the Production Part Approval Process ("PPAP") for all engine components, parts, or Engines supplied by Mast to PSI.

(i)     PSI will be responsible for PPAP for all engine components, parts, or accessories procured by PSI from suppliers other than Mast.

(j)     After a prototype of each Engine is accepted and approved by PSI, Mast will work with PSI in good faith to resolve any subsequent design issues.

(k)     With respect to each Engine, PSI will be responsible for engine calibration, emissions certification, validation, durability testing, process testing, service parts, and engine manuals. PSI will be the manufacturer of record for each Engine.

(l)     The initial PSI Representative shall be Dino Xykis.

(m)     The initial Mast Representative shall be Horace Mast.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

COLUMN

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

## Exhibit B

**Milestones**

1. Mast-supplied C6L Engine prototype meets EPA HD Highway GHG emissions standards, as evaluated by PSI Dynamometric Testing;

2. Mast-supplied C7L Engine prototype meets EPA HD Highway GHG emissions standards, as evaluated by PSI Dynamometric Testing;

3. 6L Engine block design approved by PSI;

4. 7L Engine block design approved by PSI;

5. 6L EPA HD Highway GHG Compliance Aluminum Cylinder Head designs approved by PSI;

6. 7L EPA HD Highway GHG Compliance Aluminum Cylinder Head designs approved by PSI;

7. 6L EPA HD Highway GHG Compliance Aluminum Cylinder Head PPAP approved by PSI;

8. 7L EPA HD Highway GHG Compliance Aluminum Cylinder Head PPAP approved by PSI;

9. 6L Engine designs approved by PSI; and

10. 7L Engine designs approved by PSI

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

## Exhibit C

### Quoted Cylinder Head Prices

1. 6L Engine Aluminum Cylinder Heads and 7L Engine Aluminum Cylinder Heads, provided "bare" (*i.e.,* unassembled), for gasoline applications.

   a. Supplied Components shall include:

      i. machined aluminum cylinder head;

      ii. valve guides;

      iii. intake valve seats; and

      iv. exhaust valve seats.

   b. Price: Cost to PSI not to exceed $390 each.

   c. Shipping: FOB Mast's facilities in Texas.

2. 6L Engine Aluminum Cylinder Heads and 7L Engine Aluminum Cylinder Heads, provided assembled, for gasoline applications.

   a. Supplied Components shall include:

      i. Machined aluminum cylinder head;

      ii. valve guides;

      iii. intake valve seats;

      iv. exhaust value seats;

      v. intake valves;

      vi. exhaust valves;

      vii. valve seals;

      viii. valve springs;

      ix. valve locks;

      x. spring retainers; and

      xi. rocker arm stands.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

NOTICE: THIS AGREEMENT CONTAINS
BINDING ARBITRATION PROVISIONS

     b.  Price: Cost to PSI not to exceed $490 each.

     c.  Shipping: FOB Mast's facilities in Texas.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

**Appendix III**

[2011 Supply Agreement Amendment]

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

## AMENDMENT TO THE 2011 SUPPLY AGREEMENT

THIS AMENDMENT TO THE 2011 SUPPLY AGREEMENT (this "Amendment"), is dated July 27th, 2021 (the "Effective Date"), by and among Power Solutions, Inc. ("PSI") and Mast Powertrain, LLC ("Mast"). The above identified entities are sometimes referred to below as a "Party" or designated collectively as "Parties." All capitalized terms used but not defined in this Amendment shall have the meanings given such terms in the 2011 Supply Agreement (as defined below).

## RECITALS

A.    On or about April 28, 2011, PSI and Mast entered into an agreement regarding Mast supplying intake manifolds to PSI for 8.8L engines (the "2011 Supply Agreement").

B.    PSI has requested engineering/specification changes (as that term is used in the 2011 Supply Agreement) to the manifolds supplied by Mast pursuant to the 2011 Supply Agreement, and to the manufacturing process that Mast has implemented, with respect to the current parts numbered 80000790 and 800001451.

C.    The Parties desire to amend the 2011 Supply Agreement as set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the parties agree as follows:

## AGREEMENT

NOW, THEREFORE, in consideration of the provisions of this Amendment, the Parties, and each of them, agree as follows:

1.    <u>Recitals</u>. The foregoing recitals are true and correct and by this reference are incorporated herein.

2.    <u>Changes to Parts No. 80000790 and 900001451</u>. Pursuant to Section 12, the Parties will work in good faith to document the engineering/specification changes requested by PSI with respect to the current parts numbered 80000790 and 800001451.

3.    <u>Amendments</u>.

(a)    Section 10 of the 2011 Supply Agreement is amended and restated to read as follows:

10.    The term of this Agreement will commence on the date hereof and will continue in full force and effect during the Production Period and until at least April 28, 2023 (the "Initial Term"). Thereafter, this Agreement will renew automatically for a period of one year unless one party give the other party at least one hundred and eighty days' notice prior to the end of the Initial Term of the Agreement, or any renewal period, of such party's desire to terminate the Agreement at the end of the Initial Term or such renewal period, as applicable.

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

4.     <u>Conflict; Ratification</u>. In the event of any conflict or inconsistency between the terms and conditions of this Amendment and the terms and conditions of the 2011 Supply Agreement, the terms and conditions of this Amendment shall control. Except to the extent modified by this Amendment, the Purchase Agreement is hereby ratified and affirmed.

5.     <u>Authority of Signing Parties and Representatives</u>. Each of the signatories to this Agreement warrants that he or she is fully authorized to enter into the terms and conditions stated herein, to execute the Settlement Agreement and to legally bind the Party on whose behalf he or she is signing.

6.     <u>Binding Effect</u>. This Agreement shall be legally binding upon the Parties' respective assigns, successors, heirs, principals, officers, directors, employees, parent companies, subsidiary companies, and affiliate companies.

7.     <u>Counterparts</u>. This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement. Each Party shall deliver its original signature page via FedEx to the other Party's counsel. To confirm that the Agreement has been executed, pending the delivery of original signatures, the Parties shall also exchange concurrently scanned PDF counterparts of their respective signatures.

8.     <u>Electronic Signatures Binding</u>. Notwithstanding anything in this Agreement to the contrary, the execution of this Agreement and transmission by electronic mail, fax, or other electronic means to the other Parties and counsel for the other Parties shall be binding on the Party signing and transmitting same to the same extent as if a counterpart of this Agreement bearing such Party's original signature had been delivered.

[Signature pages follow.]

Doc ID: a5cc5ccc6689ed88360518b3bb975b918e1e1c2d

*Confidential Attorney-Client Privileged*

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

SIGNATURES:

**MAST POWERTRAIN LLC**

Dated: _____07 / 27 / 2021_____

_____
Authorized Signature

**POWER SOLUTIONS INTERNATIONAL, INC.**

Dated: _____07 / 27 / 2021_____

_____
Authorized Signature

Power Solutions, Inc. and Mast Powertrain, LLC –
Signature Page to Amendment to the 2011 Supply Agreement

Page 3 of 3 Pages